# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 6, 2010 Session

## DONNA FAYE SHIPLEY ET AL. v. ROBIN WILLIAMS

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 02C-3204      Barbara N. Haynes, Judge**

---

**No. M2007-01217-SC-R11-CV - Filed August 11, 2011**

---

In medical malpractice actions, Tennessee adheres to a locality rule for expert medical witnesses. Claimants are required by statute to prove by expert testimony the recognized standard of acceptable professional practice in the community where the defendant medical provider practices or a similar community. Tenn. Code Ann. § 29-26-115 (2000 & Supp. 2010). Since the locality rule was enacted in 1975, Tennessee courts have reached different conclusions in interpreting it. The rule does not define "similar community," nor does it provide guidance as to how a community is determined to be "similar" to the defendant's community. In this case, we address and clarify the applicable standards that courts should use in determining whether a medical expert is qualified to testify as an expert witness in a medical malpractice case. Applying these standards, we hold that the trial court's exclusion of the claimant's two proffered medical experts under the locality rule was error. The trial court's grant of summary judgment is affirmed in part and vacated in part.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and GARY R. WADE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a separate opinion concurring in part and dissenting in part. JANICE M. HOLDER, J., filed a separate concurring opinion.

Wendy Lynne Longmire and Julie Bhattacharya Peak, Nashville, Tennessee, for the appellant, Robin Williams, M.D.

Joe Bednarz, Sr., Nashville, Tennessee, and Steven R. Walker, Memphis, Tennessee, for the appellee, Donna Faye Shipley, individually and as next friend and surviving wife of Frank Shipley, deceased.

# OPINION

## Factual and Procedural History

Dr. Robin Williams, a general surgeon, performed abdominal surgery on Donna Faye Shipley in January of 2001. Dr. Williams removed Mrs. Shipley's colon and a portion of her small intestine.[1]  On Saturday, November 17, 2001, Mrs. Shipley called Dr. Williams complaining of abdominal pain and a sore throat. Dr. Williams told her to call and make an appointment for the following Tuesday and to call her back sooner if the pain worsened or Mrs. Shipley developed a fever. Mrs. Shipley called the next day, November 18, 2001, complaining of continued abdominal pain and a fever of 102 degrees. Dr. Williams told her to go to the emergency room, called the hospital to inform the emergency room staff that Mrs. Shipley was coming in, and requested that she be seen by an emergency room physician.

Dr. Leonard Walker saw Mrs. Shipley in the emergency room of Summit Medical Center in Nashville on Sunday, November 18, 2001. Dr. Walker took Mrs. Shipley's medical history, examined her, and ordered tests including a complete blood count, urinalysis, chest x-ray, serum amylase, blood alcohol test, and computed tomography ("CT") scan to check for intra-abdominal abscess or gallstones. The tests revealed an elevated white blood cell count of approximately 21,000, low blood pressure, and a high pulse rate. Dr. Walker believed Mrs. Shipley was dehydrated and ordered an intravenous ("I.V.") bag of fluid. Dr. Walker diagnosed her with abdominal pain of unclear origin and dehydration.

While Mrs. Shipley was still being treated at the emergency room, Dr. Walker called Dr. Williams and provided her with information about Mrs. Shipley's medical condition and test results. In his deposition, Dr. Walker testified as follows about that conversation:

> I told her [Dr. Williams] I had a patient of hers here that I thought needed to be reexamined because she had abdominal pain that I couldn't explain. And I gave her all the patient's lab results, most importantly, her CT results, *asked if she could be rechecked the next day*. Based on her lab results and elevated white count, Dr. Williams thought she might have been significantly dehydrated and asked for [a] second bag of I.V. fluid and *said she'd be glad to see her in the office*.

Dr. Walker also stated that Mrs. Shipley "needed at least to be reexamined" and that it was his "understanding that she [Mrs. Shipley] would be seen by Dr. Williams the next day." Dr.

---

[1] Mrs. Shipley makes no claims of negligence regarding Dr. Williams' performance of her abdominal surgery nor Dr. Williams' post-surgical follow-up care of Mrs. Shipley before November 17, 2001.

Walker reaffirmed in his affidavit that "it was agreed that Ms. Shipley would not be admitted to the hospital, but would seek follow-up care from Dr. Williams" and that "[i]t is my understanding that Ms. Shipley was going to see Dr. Williams the next day."

Dr. Williams agreed in her deposition that "it was decided to hydrate her up and she would follow up in my office." Dr. Williams noted that the discharge instructions given to Mrs. Shipley told her to "call Dr. Williams in the AM to arrange recheck and further care." Dr. Williams said that it was her understanding that she would see Mrs. Shipley in her office on Tuesday, November 20, because Dr. Williams was not ordinarily in her office on Mondays. Later in her deposition, however, Dr. Williams testified that she understood that her medical assistant had arranged for Mrs. Shipley to be seen by her primary care physician, Dr. Lisa Long, on Wednesday, November 21.[2] Dr. Williams admitted that a white blood cell count of 21,000 in a patient with Mrs. Shipley's medical history was "a major concern to the physician caring for her."

Mrs. Shipley alleges in her complaint that she called Dr. Williams' office several times to try to get follow-up care, but she was informed that Dr. Williams would not see her because it was a non-surgical matter. On the evening of November 21, 2001, Mrs. Shipley returned to the emergency room and was admitted in critical condition with a diagnosis of acute sepsis, pneumonia, hypotension, acute renal failure, and abdominal pain. In the course of her subsequent treatment, Mrs. Shipley suffered a debilitating stroke and other alleged permanent damage.

Mrs. Shipley filed this action against Drs. Walker and Williams and the hospital, alleging medical negligence in failure to admit her to the hospital on November 18, failure to properly assess and diagnose her condition, and failure to provide necessary medical treatment, including adequate follow-up care. The hospital and Dr. Walker filed motions for summary judgment that were unopposed by Mrs. Shipley. The trial court granted the hospital and Dr. Walker summary judgment and those rulings have not been appealed.

The remaining defendant, Dr. Williams, moved for partial summary judgment on the claim of negligent failure to admit to the hospital. In support of her motion, Dr. Williams relied upon the testimony of Mrs. Shipley's two medical experts – Dr. Stephen K. Rerych,

_____

[2] Because Dr. Long was hospitalized with meningitis at that time, it was impossible for her to have seen Mrs. Shipley. It is unclear at what point Dr. Williams' office became aware of Dr. Long's condition. Dr. Williams stated, "I don't know if Dr. Long's office gave Grace [Dr. Williams' medical assistant] an appointed time or if Dr. Long's office was going to contact Ms. Shipley for an actual time. All I know is that the patient was given an appointment or was going to be given an appointment to be seen on that Wednesday."

a board-certified general surgeon who practices in Asheville, North Carolina, and Dr. Ronald A. Shaw, a physician board-certified in emergency medicine who practices in the Montgomery, Alabama, area. Drs. Rerych and Shaw testified to the effect that the treatment provided by Dr. Walker at the emergency room did not necessarily fall below the standard of care and that the appropriate standard of care, given Mrs. Shipley's medical condition, required *either* admission to the hospital on November 18 *or* a follow-up appointment and recheck the next day after her release on November 18. The trial court granted partial summary judgment to Dr. Williams on the failure to admit claim based on the testimony of Drs. Rerych and Shaw that the failure to admit did not necessarily result in a breach of the standard of care under the circumstances presented.

Dr. Shaw further testified that it is the responsibility of the consulting physician, in this case Dr. Williams, to make the decision whether to admit a patient and how to provide follow-up rechecking and medical care after consulting with the emergency room physician. Dr. Shaw stated that emergency room physicians generally suggest and assume that patients with abdominal pain are rechecked within 24 hours of discharge because of the possibility of the patient's condition rapidly worsening. Dr. Shaw testified that under Mrs. Shipley's circumstances, "it was incumbent on Dr. Williams to either examine the patient or – in her office or make some arrangements to be seen somewhere."

Dr. Rerych testified that under the circumstances presented here, "the general surgeon's follow-up is absolutely imperative, and the follow-up in this case should have been done within 24 hours, no question about that." Dr. Rerych stated that regarding the "general surgeon, who is now consulted and who has recommended that this patient come to the emergency room, then it's the general surgeon's responsibility to either admit the patient that day or see the patient the following day." Dr. Rerych testified that given Mrs. Shipley's history of inflammatory bowel disease and surgery, "we must make sure that it isn't a problem with the bowel" and that there was a "need to have extreme vigilance, and you need to follow up on a patient like this." Dr. Rerych concluded that "the bottom line was this patient should have been seen 24 hours after the discharge from the emergency room," and that "clearly, in this case, there is a deviation from the standard of care."

On December 1, 2006, Dr. Williams moved for disqualification of Drs. Rerych and Shaw and for full summary judgment. These motions were filed just over a month before trial and after the expiration of the expert disclosure deadline.[3] The trial court held that Drs. Rerych and Shaw "do not meet the requirements of Tenn. Code Ann. § 29-26-115 and will

---

[3] Dr. Williams' counsel deposed Dr. Rerych on January 17, 2006 and Dr. Shaw on February 27, 2006, but did not file the motion to exclude their testimony and the motion for summary judgment until December 1, 2006.

not substantially assist the trier of fact pursuant to Tenn. R. Evid. 702 and 703." Specifically, the trial court ruled that Dr. Rerych "did not demonstrate familiarity with the standard of care for general surgeons in Nashville . . . Nor did he demonstrate that Asheville, North Carolina is a similar community to Nashville, Tennessee." As to Dr. Shaw, the trial court held that he "does not practice in a specialty that is relevant to the standard of care issues in this case." The trial court excluded their testimony, granted Dr. Williams summary judgment, and dismissed Mrs. Shipley's case.

The Court of Appeals upheld the trial court's decision to disqualify Mrs. Shipley's medical experts, but, noting that "Dr. Williams . . . offered *no proof* to negate Mrs. Shipley's remaining negligence claims whatsoever, but moved for summary judgment based solely on the inadmissibility of Mrs. Shipley's experts," reversed summary judgment upon its finding that Dr. Williams failed to affirmatively negate an essential element of Mrs. Shipley's claims or show that she could not prove an essential element of the claim at trial. Shipley v. Williams, No. M2007-01217-COA-R3-CV, 2009 WL 2486199, at *6-7 (Tenn. Ct. App. Aug. 14, 2009) (emphasis in original). Regarding Mrs. Shipley's negligence claim based on Dr. Williams' failure to admit her to the hospital, the intermediate court noted that the sole means by which Dr. Williams had negated an element of her claim (breach of the applicable standard of care) was through the testimony of Drs. Rerych and Shaw. Because the trial court later disqualified Drs. Rerych and Shaw as expert witnesses and excluded their testimony, there was no proof in the record to affirmatively negate an element of the failure to admit claim. In so ruling, the Court of Appeals observed that "there are dangers in relying upon plaintiff's experts at one stage in the proceeding when their testimony is beneficial and then later disqualifying [them] when their testimony is not helpful." Id. at *6 n.3.

We granted permission to appeal in order to address and clarify the standards a Tennessee court should use in determining whether a medical expert is qualified to testify as an expert witness in a medical negligence case.

## Analysis

### *Summary Judgment Standard*

Summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 5 (Tenn. 2008); Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn. 1993).[4] In Hannan, this Court reaffirmed the basic

---

[4] Motions for summary judgment are screening devices to identify cases that are not "trial-worthy."
(continued...)

principles guiding Tennessee courts in determining whether a motion for summary judgment should be granted, stating:

> The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." Byrd, 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. Id.
> . . . .
> . . . [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

Hannan, 270 S.W.3d at 5, 8-9. It is insufficient for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." Id. at 10. "Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient." Martin v. Norfolk S. Ry. Co., 271 S.W.3d 76, 84 (Tenn. 2008). If the party moving for summary judgment fails to satisfy its initial burden of production, the burden does not shift to the nonmovant, and the court must dismiss the motion for summary judgment. Hannan, 270 S.W.2d at 5; Blanchard v. Kellum, 975 S.W.2d 522, 525 (Tenn. 1998).

The standard by which our courts must assess the evidence presented in support of, and in opposition to, a motion for summary judgment is also well established:

> Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. Byrd, 847 S.W.2d at 210-11.

---

[4](...continued)
Judy M. Cornett, Trick or Treat? Summary Judgment in Tennessee After *Hannan v. Alltel Publishing Co.*, 77 Tenn. L. Rev. 305, 337 (2010) (observing that "Tennessee has traditionally favored merits-based determinations over efficiency").

Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009).  This Court stated the applicable summary judgment standard in Martin as follows: "*the nonmoving party's evidence must be accepted as true*, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party."  Martin, 271 S.W.3d at 84 (citing McCarley v. W. Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998)) (emphasis added).  "Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness."  Martin, 271 S.W.3d at 84.

These summary judgment principles are applicable in the same way and with equal force in a medical malpractice case as in any other civil action.  See Cox v. M.A. Primary & Urgent Care Clinic, 313 S.W.3d 240, 248 (Tenn. 2010); Kelley v. Middle Tenn. Emergency Physicians, P.C., 133 S.W.3d 587, 591, 596 (Tenn. 2004); Moon v. St. Thomas Hosp., 983 S.W.2d 225, 229 (Tenn. 1998); Bowman v. Henard, 547 S.W.2d 527, 529-30 (Tenn. 1977).

The Court of Appeals correctly observed in this case that Dr. Williams presented no proof to negate an element of Mrs. Shipley's claims except in her failure to admit to the hospital claim.  As the intermediate court noted, "Dr. Williams filed excerpts from her deposition that do not address the applicable standard of care and whether she met it.  Unlike Dr. Walker, Dr. Williams has filed no affidavit about the applicable standard of care and whether she met it."  Shipley, 2009 WL 2486199, at *7.  Dr. Williams admits in her appellate brief that she did not meet Hannan's first prong requiring her to affirmatively negate an essential element of the nonmoving party's claim.  She argues, however, that she has successfully met Hannan's second prong by showing that Mrs. Shipley cannot prove an essential element of her claim at trial because the trial court disqualified Mrs. Shipley's expert medical witnesses and the trial court's scheduling order deadlines for disclosure of expert witnesses had passed long before Dr. Williams moved for disqualification and summary judgment.  Our resolution of this issue hinges on the correctness of the trial court's ruling excluding Drs. Rerych and Shaw as expert witnesses based on Tennessee Code Annotated section 29-26-115.

### *Expert Testimony in Medical Malpractice Cases – The Locality Rule*

Tennessee Code Annotated section 29-26-115 sets forth the required elements of proof in subsection (a), and the requirements for competency of a proffered medical expert in subsection (b), in a medical malpractice case:

(a)   In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Tenn. Code Ann. § 29-26-115 (2000 & Supp. 2010). Thus, expert testimony must be provided by a plaintiff to establish the elements of his or her medical negligence case, Williams v. Baptist Mem'l Hosp., 193 S.W.3d 545, 553 (Tenn. 2006); Stovall v. Clarke, 113 S.W.3d 715, 723 (Tenn. 2003); Robinson v. LeCorps, 83 S.W.3d 718, 724 (Tenn. 2002), subject to the "common knowledge" exception that is not applicable here.[5]

An essential element of a claimant's proof is the "recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community." Tenn. Code Ann. § 29-26-115(a)(1). This requirement is known as the "locality rule."

Before the Legislature enacted the locality rule in 1975, Tennessee courts applied a common law "strict locality" rule, requiring proof of the standard of care in the same locality as the defendant. Thompson v. Methodist Hosp., 367 S.W.2d 134, 136 (Tenn. 1962) ("standards prevailing in any hospital in Memphis"); Gresham v. Ford, 241 S.W.2d 408, 410 (Tenn. 1951) ("in that vicinity"); Floyd v. Walls, 168 S.W.2d 602, 607 (Tenn. Ct. App. 1941) ("the locality where he practiced"); Haskins v. Howard, 16 S.W.2d 20, 23 (Tenn. 1929) ("same locality"). The justification for the rule in Tennessee and elsewhere was the assumption that doctors in an urban community had more access to medical resources and

---

[5] See Seavers v. Methodist Med. Ctr. of Oak Ridge, 9 S.W.3d 86, 92 (Tenn. 1999); Bowman, 547 S.W.2d at 530-31.

opportunities than doctors in rural areas. Sutphin v. Platt, 720 S.W.2d 455, 457 (1986); Joseph H. King, Jr., The Standard of Care and Informed Consent Under the Tennessee Medical Malpractice Act, 44 Tenn. L. Rev. 225, 256-57 (1977); see, e.g., Small v. Howard, 128 Mass. 131, 136 (1880) (overruled by Brune v. Belinkoff, 235 N.E.2d 793,798 (Mass. 1968)).[6]

As our society became more interconnected with improved transportation and communications, the strict locality rule gave way to a more relaxed modified locality rule in many states, including Tennessee. See McCay v. Mitchell, 463 S.W.2d 710, 718 (Tenn. Ct. App. 1970) ("Admittedly the 'locality' rule has been relaxed, and the knowledge possessed by a physician which renders him competent to testify as an expert can be from sources and experience other than in the locality in which the cause of action arose"). The adoption of a "same or similar" locality rule in 1975, reflected a "somewhat broadened definition of the geographic component to the medical standard of care," a loosening of the traditional common law "strict" locality rule that required a plaintiff "to introduce evidence concerning the standard of care in the strict locality where the defendant worked." Sutphin, 720 S.W.2d at 457 (Tenn. 1986). Under this rule, a medical expert in a Tennessee court must demonstrate that he or she is familiar with either the standard in the community where the defendant practices or a "similar community." Tenn. Code Ann. § 29-26-115."[7]

At the outset, we make an observation that is both basic and of fundamental importance to our analysis: the statute does not define "similar community," nor does it

---

[6] The locality rule has its origins in Massachusetts in 1880. See Small, 128 Mass. at 136. This was only four years after Alexander Graham Bell was issued a patent for the telephone. Since that time, significant and substantial improvements in technology and communications have made medical resources and information widely available to doctors in urban and rural settings. See Brune, 235 N.E.2d at 796-98.

[7] The locality rule has been subjected to much criticism from learned commentators, see Joseph H. King, Jr., The Standard of Care and Informed Consent Under the Tennessee Medical Malpractice Act, 44 Tenn. L. Rev. 225, 262-63 (1977) ("Inflexible geographic limitations on the standard of care are inconsistent with an increasingly uniform practice of medicine as suggested by modern medical education, instantaneous communications, and ubiquitous medical literature and access to information"); Scott A. Behrens, Note, Call in Houdini: The Time has Come to be Released from the Geographic Straitjacket Known as the Locality Rule, 56 Drake L. Rev. 753 (2008); see generally Steven E. Pegalis, Community v. National Standard of Care, 1 Am. Law Med. Malp. 3d § 3.5 (updated 2010), and from courts, see, e.g., Robinson, 83.S.W.3d at 724 ("[W]e encourage the General Assembly to reconsider the current statutory framework of the locality rule."); Carpenter v. Klepper, 205 S.W.3d 474, 484 (Tenn. Ct. App. 2006) ("The legislatively mandated 'similar locality rule' has long since outlived its usefulness," and "We . . . implore the Legislature to relegate the 'similar locality rule' to the 'ash heap' of history."); see also Shilkret v. Annapolis Emergency Hosp. Ass'n, 349 A.2d 245, 252 (Md. 1975) (reviewing rationales for locality rules and a national standard of medical care, and concluding that "justification for the locality rules no longer exists").

provide any guidance as to how a community is determined to be "similar" to that where the defendant practices. Thus, it has fallen to the courts to determine the standards for when a medical expert has sufficiently established his or her familiarity with the defendant's community or a "similar community."

A trial court's determination of whether an expert is qualified to provide testimony is of critical importance to a claimant's malpractice action. See Bowman, 547 S.W.2d at 530 (Stating that although summary judgment is disfavored in a medical malpractice case as a general rule, finding exception "if the only issue is one of the kind on which expert testimony must be presented, and nothing is presented to challenge the affidavit of the expert, summary judgment may be proper"); Kenyon v. Handal, 122 S.W.3d 743, 758-59 (Tenn. Ct. App. 2003) (Noting that "[i]t is now commonplace for medical practitioners to challenge the qualifications of the patient's expert" and observing that "[p]atients who are unable to produce an expert affidavit of their own face almost certain dismissal of their complaint"); Coyle v. Prieto, 822 S.W.2d 596, 598 (Tenn. Ct. App. 1991) (Observing that "plaintiff's case . . . stands or falls on the correctness of the trial court's ruling" that his expert was qualified to testify). Trial courts called upon to decide whether a claimant's expert should be allowed to testify are therefore often deciding much more than a pretrial evidentiary skirmish, but rather whether the claimant's action should be summarily dismissed, or allowed to be evaluated by a jury of his or her peers.

A review of the Tennessee cases interpreting and applying the locality rule in evaluating the qualifications of a proffered medical expert reveals that its application has been difficult and not entirely consistent. We agree with the Court of Appeals' observation in Totty v. Thompson, 121 S.W.3d 676, 679 (Tenn. Ct. App. 2003), that "[f]ew areas of American Jurisprudence have been more challenging through the years than the development of the standard of care applicable in medical malpractice cases."

This Court first considered a challenge to the qualifications of a claimant's expert under the locality rule in Searle v. Bryant, 713 S.W.2d 62 (Tenn. 1986). The proffered medical expert was an infectious disease specialist and microbiologist who served as the director of the Vanderbilt University Medical Center clinical microbiology laboratory. The expert testified that he had performed infectious disease consultations and visited many of the smaller hospitals in the Middle Tennessee area, and that he was familiar with the standard of acceptable medical practice in the Middle Tennessee area. Id. at 64. The Searle Court stated the following regarding the expert's familiarity with the Middle Tennessee area:

> Although [plaintiff's expert] Dr. Stratton did not know the location of several cities in Middle Tennessee, he was familiar with Smithville and other cities. He indicated his familiarity with the recognized standard of acceptable

medical practice in the smaller communities in Middle Tennessee by testifying that he knew that such hospitals have infectious disease control committees which set up standards for precautions to be taken once an infection is discovered, and that they have the capability to culture for anaerobic bacteria, a procedure, he stated which the recognized standard of care required in this case.

. . . Dr. Stratton's testimony that he was familiar with the standard of acceptable medical practice in the Middle Tennessee area with regard to the prevention and treatment of surgical wound infections implies that the same such standard exists throughout the Middle Tennessee area. As a result, under the circumstances of this case we are of the opinion that the testimony was admissible.

Id. at 64-65. The Court reversed the trial court's decision to disqualify the expert and its directed verdict in the defendant's favor. Id. at 65.

In Sutphin, this Court upheld the locality rule's "contiguous state" geographic limitation on the qualification of a medical expert, Tennessee Code Annotated section 29-26-115(b), against a constitutional due process/equal protection challenge. In so doing, the Court noted that "in light of a modern trend towards the national standardization of medical practices, especially in specialties, courts and legislatures have gradually expanded the relevant geographic area for proving the medical standard of care." Sutphin, 720 S.W.2d at 457.

In 2002, the claimant requested this Court in Robinson to "enlarge the scope of the 'locality rule' . . . *by adopting a national standard of care* that would reflect the modern changes and improvements in the practice of medicine, medical technology, and communication." 83 S.W.3d at 722 (emphasis added). The Court declined to adopt a national standard, noting that its "adoption" of a broad national standard in malpractice cases would be inconsistent with the locality rule. Id. at 723-24. The Robinson Court adhered to the statutory requirement that a proffered medical expert "must have knowledge of the standard of professional care in the defendant's applicable community or knowledge of the standard of professional care in a community *that is shown to be similar* to the defendant's community." Id. at 724 (emphasis in original). But we further stated that "[t]his Court is mindful, however, that in many instances the national standard would indeed be representative of the local standard, especially for board certified specialists" and observed that "an expert's discussion of the applicability of a national standard does not require exclusion of the testimony." Id. In Robinson, we held that the proffered expert "did not establish the standard of professional care in Nashville, Tennessee, or in a similar

-11-

community" where the expert "testified only that the applicable standard of care in this case 'would be expected' to be the same as the national standard of care and that '[t]here is no differentiation recognized in . . . one locality as opposed to the other, certain localities comparable with Nashville.'" Id.

A year later, in Stovall v. Clarke, this Court considered the propriety of the trial court's summary judgment in favor of two medical malpractice defendants and provided further guidance regarding the application of the locality rule. 113 S.W.3d 715, 722-23 (Tenn. 2003). The Stovall Court distinguished the case before it from Robinson and held the proof to be sufficient to qualify the proffered medical expert to testify in a Williamson County, Tennessee, medical negligence action. The proffered expert testified that he did not rely upon a national standard of care, nor did he equate the local standard with a national standard. Although he had never practiced medicine in Tennessee, he testified that he had reviewed over twenty medical charts from Tennessee, had testified in three other malpractice cases in middle Tennessee, and "had reviewed statistical information about the medical community in Williamson County, Tennessee, which included information about the medical specialists and resources available at the Williamson County Medical Center." Id. at 723 (citation omitted). We observed that the defendant doctor's arguments for the exclusion of the plaintiff's proffered expert essentially contested the weight of the doctor's statements and thus misapprehended "the procedural context of this case: the proper analysis with respect to summary judgment is whether the evidence, when viewed in a light most favorable to the plaintiff, raises a genuine issue as to a material fact." Id. We concluded that the trial court erred in granting summary judgment to the defendant doctors. Id. at 725.

In Hunter v. Ura, 163 S.W.3d 686 (Tenn. 2005), the defendants argued that the trial court erred in allowing the testimony of the plaintiff's expert witness "because he did not know the recognized standard of professional care in the community in which the defendant Ura practiced or in a similar community." Id. at 706-07. We held the following proof submitted by the proffered medical expert, Dr. Witt, sufficient to qualify him to testify:

> Dr. Witt was a board-certified anesthesiologist who had practiced in Lexington, Kentucky since 1980. Dr. Witt testified that he was involved with the Academic Association of Anesthesia Program Directors, which was an organization "with people from Vanderbilt, from Lexington, and the surrounding area." Dr. Witt had attended a meeting of the Southern University Department of Anesthesia Chairs at Vanderbilt in Nashville, Tennessee. Dr. Witt stated that he had been to Nashville six or seven times, that he knew the Chair at Vanderbilt's anesthesia department very well, and that he was "familiar, in a regional setting, [with] the general kinds of care offered [ ] in Lexington as well as in Nashville." Dr. Witt discussed several hospitals in

Nashville and stated that the standard of professional care in this case "would be approximately the same as what we would see at some of the hospitals where I have been in Nashville."

Id. at 708 (brackets in original). After reviewing our holdings in Robinson and Stovall, we reiterated that a medical expert may not "rely *solely* on a national standard of care" but instead must "'show[] some underlying basis for his testimony." Id. (emphasis added).

In Williams, we observed that "[e]xpert witnesses may not simply assert their familiarity with the standard of professional care in the defendant's community without indicating the basis for their familiarity." 193 S.W.3d at 553. We summarized the proof contained in the proffered expert's affidavit as follows and found it to be insufficient to qualify him to testify:

> Dr. Gordon, a board-certified anesthesiologist who practiced in Winchester, Tennessee, stated that he was "familiar with the recognized standard of acceptable professional medical care in the metropolitan areas of Tennessee and specifically in Memphis, Tennessee and similar communities. . . ." The affidavit contains no information regarding the basis for Dr. Gordon's familiarity with the standard of care in Memphis, Tennessee, nor does it contain a basis for finding that the standard of care in Memphis is similar to that in the community in which Dr. Gordon practices. In short, Dr. Gordon's affidavit simply asserts that he is familiar with the applicable standard of care. As we have explained in prior cases, a bare assertion of familiarity is insufficient under Tennessee Code Annotated section 29-26-115(a)(1). Accordingly, we conclude that the affidavit was legally insufficient.

Id. at 554.

The Court of Appeals has likewise struggled in addressing the question of the applicable standards to determine whether a medical expert has been qualified to testify by showing familiarity with the defendant's medical community or a similar community. In Ayers v. Rutherford Hosp., Inc., 689 S.W.2d 155 (Tenn. Ct. App. 1984), the court affirmed the disqualification of a medical expert because it was not shown that he had practiced medicine in a contiguous state during the year prior to the injury and because he had not sufficiently demonstrated that he was familiar with the defendant's medical community or a similar community. The proffered expert stated in an affidavit that he was "familiar with the standard of care required of physicians in delivery and perinatal care of newborns as it

would pertain to a community such as Murfreesboro, Tennessee." Id. at 159. But the expert also testified by deposition

> that he had never been to Murfreesboro, that he did not know where in Tennessee Murfreesboro was located, that he knew nothing about the size of the community, that he did not know how large the hospital was, that he knew no one from Murfreesboro, and that he knew no one who had ever practiced medicine in the city.

Id. When he was asked if he was familiar with the skills of the practitioners in Murfreesboro, the proffered expert answered:

> "Insofar as they are trained and examined and have developed the same sets of skills, read the same literature, update their skills, go to the same conferences for continuous education that I do, come to my conferences when I give them in Tennessee." He testified that the standard of care "does not vary throughout the country," that it is a national standard, and "doesn't change with the locality."

Id.

In Ledford v. Moscowitz, 742 S.W.2d 645 (Tenn. Ct. App. 1987), the defendant doctor practiced in Bradley, Polk, and McMinn counties, and the proffered expert practiced in Atlanta, with "one-third of this practice coming from referrals from small towns outside the Atlanta area." Id. at 648. The court, noting that the statute did not require "[p]recise knowledge" of a community's "specific medical statistics," id., held that the trial court erred in disqualifying the proffered expert witness and reversed summary judgment, stating:

> Stuart [plaintiff's expert] testified that he was familiar with the standard of care in small towns all over Georgia. He said that he was familiar with the standard of care in Ducktown and Cleveland in a broad sense, and that he saw what doctors were doing and the standard of practice from examining the patients' treatment records on referrals from outlying areas, and that recommendations for treatment were sent back to the referring physicians in the patient's home area. Stuart did testify that he had not been to Cleveland, Tennessee, and did not know the number of hospitals, doctors, or physicians located there. Precise knowledge of the specific medical statistics of a particular community, however, is not a requirement of the statute.

Id. The Ledford court concluded:

-14-

We think that, taken as a whole, Stuart's proof creates a material issue of fact on the standard of acceptable psychiatric practice in similar communities to those found in the Polk, McMinn, and Bradley county area. Although medical malpractice actions impose more rigorous procedural requirements on the plaintiff, once the threshold of proof has been crossed[,] as it has been here by Plaintiffs' expert Stuart, then the case should proceed to trial on the merits.

Applying the scope of review as set out above, together with this Court's view that summary judgments are generally inappropriate in tort actions, Bowman v. Henard, 547 S.W.2d 527 (Tenn. 1977), the summary judgment of the trial court is reversed and this cause is remanded for trial on the merits.

Id. at 649.

In Coyle v. Prieto, the defendant doctor was a pathologist practicing in Memphis, and the plaintiff's expert was a doctor who practiced internal medicine and emergency room practice in Missouri. 822 S.W.2d at 598 (Tenn. Ct. App. 1991). The court held the following proof offered by the plaintiff's expert sufficient to qualify him as a testifying expert:

During the *voir dire* of Dr. Wettach, he testified that he had participated in the work-up of perhaps two hundred patients with lung cancer, that he was familiar with the standard of care for arriving at a diagnosis of adenocarcinoma in lungs; that he was familiar with the standard of care in Memphis; that the standard of care in Memphis in the medical community was similar to that in St. Louis; that he was familiar with the way the medical profession goes about arriving at a diagnosis; that he was competent to testify about the standard of care for a pathologist in arriving at a diagnosis; that because of the network of medical information existing at the time of trial, the standard of care was pretty much uniform throughout the country; and finally, because of his training, education, and experience, he was competent to render an expert opinion about the manner and method in which the defendant arrived at his diagnosis. He stated that he arrived at his position by reviewing the x-rays in the patient's medical file, the patient's history, and the physical; and in addition, by reading some of the depositions taken in the case.

Id. The Coyle court did not indicate that the Missouri doctor provided any further testimony elaborating on or supporting his statement "that the standard of care in Memphis in the medical community was similar to that in St. Louis." But the court concluded that the

-15-

proffered expert "was competent to testify with regard to the recognized standard of acceptable medical practice. The objection raised by defendant goes more to the weight of the evidence rather than to its admissibility." Id. at 600.

In Mabon v. Jackson-Madison Cnty. Gen'l Hosp., 968 S.W.2d 826 (Tenn. Ct. App. 1997), the defendant doctor was a surgeon practicing in Jackson, Tennessee, and the plaintiff's expert was a surgeon practicing in Missouri. The Mabon court summarized the plaintiff's expert's testimony, which the court held to be insufficient, as follows:

> Dr. Shane states in his affidavit that he was familiar with the recognized standard of acceptable medical practice in an area such as Jackson, Tennessee and at a facility the size of Hospital. He further states that the standard of care in Jackson and at Hospital would be comparable to the cities and facilities at which he has practiced medicine and is the same for New York city and other large cities and, in effect, is a national standard. Dr. Shane also states that Dr. Thomas failed to meet the standard of care that "*should have been available*" in a city the size of Jackson, Tennessee. (Emphasis supplied). Dr. Shane's statement concerning the standard of care that "should have been available" is significant in that it illustrates that his statement in his affidavit regarding the standard of care is premised on the national standard of care and not on the standard of care for Jackson or similar communities. Admittedly, in his discovery deposition, he quite readily admits his complete lack of knowledge of Jackson's medical community[.]

Id. at 830. The court observed that "a complete lack of knowledge concerning a community's medical resources would be contrary to knowledge of the required standard of care" and stated that "we cannot accept Dr. Shane's bare assertion that the standard of care in Jackson is the same nationwide and that the level of care with which Dr. Shane is familiar *should* have been available in Jackson." Id. at 831 (emphasis in original).

In Roberts v. Bicknell, 73 S.W.3d 106 (Tenn. Ct. App. 2001), the court was presented with a set of facts similar to those in Mabon, in that the defendant practiced in Jackson and the proffered expert "quite candidly admitted to knowing nothing about the practice of medicine in Jackson, Tennessee and the applicable standard of care for that locality." Id. at 113. The court, affirming summary judgment and the trial court's disqualification of plaintiff's expert, reiterated that "[t]he law on expert witnesses, as it exists in Tennessee, requires the expert to have *some* knowledge of the practice of medicine in the community at issue or a similar community," and stated that "[w]e believe that it is reasonable to base such knowledge, among other things, upon information such as the size of the community, the

-16-

existence or non-existence of teaching hospitals in the community and the location of the community." Id. at 114 (emphasis in original).

In Wilson v. Patterson, 73 S.W.3d 95 (Tenn. Ct. App. 2001), the defendant doctor practiced in Memphis, and the plaintiff's expert practiced in Lexington, Kentucky. The plaintiff's expert provided the following testimony:

> Dr. Swan, in his deposition, indicates that there is a national standard of care for physicians in this particular specialty and that therefore he is familiar with the standard of care in Memphis, Tennessee. In his second affidavit, which was stricken by the trial court, he establishes that he is familiar with the recognized standard of care in the field of obstetrics and gynecology in Lexington, Kentucky, by virtue of his experience set out in his affidavit. He also opines that Lexington, Kentucky and Memphis, Tennessee are similar areas with regard to the standard of care of acceptable professional medical services, stating: "Both Lexington, Kentucky and Memphis, Tennessee are regional medical centers and are the locations of their state medical schools." The affidavit goes somewhat further stating that because of Dr. Swan's involvement in medical malpractice cases in Memphis, Tennessee,[8] he has the opinion that the recognized standard of care of acceptable professional medical services of obstetrics and gynecology in Memphis is the same as that in Lexington.

Id. at 103. The Wilson court, reversing the trial court's disqualification of the expert and summary judgment in defendant's favor, concluded that "[a]lthough Dr. Swan's testimony concerning the similarity of Lexington and Memphis is somewhat meager, we believe this

---

[8] The plaintiff's expert, Dr. Swan, further stated:

> I have testified in at least ten medical malpractice cases in Memphis, Tennessee. As a consequence, I have had the opportunity to review the depositions of and hear the testimony of numerous Memphis, Tennessee physicians on the recognized standard of care of acceptable professional medical practice in the field of gynecology and obstetrics. This has confirmed my opinion that the recognized standard of care of acceptable professional medical practice in the field of obstetrics and gynecology in Memphis, Tennessee is the same as that of Lexington, Kentucky in regard to the way that patients are evaluated for diagnostic laparoscopys and the manner in which the laparoscopic procedure is executed.

Wilson, 73 S.W.3d at 100.

testimony in conjunction with Dr. Swan's testimony concerning his knowledge of the standard of care of Memphis is barely sufficient to withstand attack at the summary judgment stage of the proceeding." Id. at 105.

In Kenyon v. Handal, 122 S.W.3d 743 (Tenn. Ct. App. 2003), the court affirmed the trial court's disqualification of plaintiff's expert, who practiced in Douglasville, Georgia, on the grounds that the expert's affidavit did not contain sufficient facts to demonstrate that his opinion "is based either on his familiarity with the applicable standard of professional practice in Gallatin or Sumner County or on his knowledge of the applicable standard of professional practice in a community similar to Gallatin or Sumner County" where the defendant practiced. Id. at 762. The court observed:

> Nothing in Dr. Kumar's affidavit indicates that he has any personal knowledge of the practice of obstetrics and gynecology in Gallatin or Sumner County. Accordingly, he can comply with Tenn. Code Ann. § 29-26-115(a)(1) only by demonstrating that he knows the applicable standard of professional practice in a community that is similar to Gallatin or Sumner County.
>
> Dr. Kumar does not assert that Douglasville, Georgia where he practices is similar to Gallatin or Sumner County. He bases his familiarity with the applicable standard of care of an obstetrician in January 1998 at the Sumner Regional Medical Center in Gallatin on his conclusion that the standards of professional practice in the State of Georgia are the same as those in the State of Tennessee. Generalizations regarding the similarity of the standards of professional care in two contiguous states are not specific enough information to demonstrate that a medical practitioner is qualified under the locality rule to render an opinion in a medical malpractice case.

Id.

In Bravo v. Sumner Reg'l Health Sys., Inc., 148 S.W.3d 357 (Tenn. Ct. App. 2003), the defendant, a doctor practicing in Gallatin, argued that the affidavit of the plaintiffs' expert, who practiced in Georgia, did not satisfy the requirements of the locality rule. Id. at 368. The court disagreed, finding as follows:

> Dr. Engel's affidavit, however, sets out sufficient evidence to show that he was familiar with the standard of care either in Gallatin or in a similar community. In his affidavit, Dr. Engel states that, through his service on the TennCare review board, he has "become familiar with the medical resources available to obstetricians in communities similar in size to Gallatin," and he is

"familiar with the treatment, care and skill of practitioners in communities similar to Gallatin." Further, he states that he has reviewed literature and data regarding Gallatin, and he compares it with communities he claims are similar in size, namely Rome, Floyd County, Georgia, and Columbus, Muscogee County, Georgia. He asserts that, "[b]ecause of the referrals I receive from Muscogee County and Floyd County, I am familiar with the standard procedures and practices of obstetricians in Georgia communities similar to Gallatin." He also states that he is "familiar with the standard of care for obstetrics and gynecology in 2000 in Rome, Floyd County, Georgia," and that he is "familiar with the standard of care for obstetrics and gynecology in 2000 in Columbus, Muscogee County, Georgia." Finally, Dr. Engel states that he has visited hospitals in communities similar to Gallatin, and he has attended seminars where he further became familiar with the standard of care for obstetricians in communities similar to Gallatin.

Id. Reversing the trial court's disqualification of plaintiffs' expert, the court concluded that "Dr. Engel's affidavit, *viewed in a light most favorable to the Plaintiffs*, satisfies the 'locality rule' requirements of the statute." Id. at 369 (emphasis added).

In Carpenter v. Klepper, 205 S.W.3d 474 (Tenn. Ct. App. 2006), the court held that two expert medical witnesses called to testify by the defendants were not qualified under the locality rule. The defendants proffered the testimony of a doctor who practiced in Kentucky, whose testimony the court summarized as follows:

Dr. Aaron testified as to the number of beds at the Clarksville hospital, the medical technology available, and the proximity of the city to a larger metropolitan area. Clearly, Dr. Aaron's testimony established that he had some knowledge as to the medical community in Clarksville.

. . . Dr. Aaron was admittedly unfamiliar with the standard of care in Clarksville, having practiced solely in Louisville, Kentucky. He asserted that he was, however, "intimately" familiar with the standard of professional practice in communities similar to Clarksville, having served on a federally mandated medical care quality assurance committee for the state of Kentucky which collected statistical information from participating hospitals and medical regions throughout the state, some of which had communities similar to Clarksville.

. . . .

-19-

Although Dr. Aaron testified that he had treated patients from communities similar to Clarksville, he further stated that his care of those patients was no different than the care he provided to his regular patients in Louisville.

Id. at 478-80. Although Dr. Aaron further testified that "I do know what the standard of care for closure of trocar sites would be in any accredited institution in Kentucky because I am a surgeon. I'm familiar with those standards and I know how they are applied," and asserted that he had seen "many [patients] from areas similar to Clarksville," Id. at 479, 480, the Carpenter court held that he failed to establish the necessary showing of familiarity with a community similar to Clarksville. Id. at 480.

The defendants in Carpenter also proffered the expert testimony of a Dr. DeMaria, the chief of general surgery and professor of surgery at the University Medical College of Virginia located in Richmond, Virginia, who was also a fellow of the American College of Surgeons. Id. at 481. Dr. DeMaria testified as follows regarding his knowledge of the Clarksville medical community:

> Q. How are you familiar with the standard of care [in Clarksville]?
> A. Well, during my tenure in Richmond, I've practiced in community hospitals outside of the city. I actually live in a county outside of Richmond that's about the same size as Montgomery County here.
> I have worked in several 200-bed – approximate size – hospitals in the Virginia area and have done laparoscopic surgery in those hospitals on a number of occasions.
> I've also traveled in my role as a teacher to numerous communities that are very similar to this in other states.
> . . . .
> I think Dr. Black had provided a supplement that I looked at that says that Montgomery County has about 135,000 people. I think I mentioned before that I know about the hospital, the size of the hospital, its capabilities, and so forth.
> . . . .
> [The defendants' hospital has] about 200 or so beds. They have an emergency room. They have cancer treatment. They have most of the standard specialties represented. I think they have about 150 staff physicians with privileges there.
> . . . .
> . . . I have, you know, encountered other situations that are very similar in both my own local environment in Virginia, knowing physicians who worked in smaller hospitals working with them on a regular basis, as well

as traveling to numerous smaller hospitals, having a chance to develop relationships with surgeons, physicians. I offer courses at our institution. We have many surgeons travel to Richmond where we have several days of interaction, and so forth.

Id. at 480-82. The Carpenter court held that Dr. DeMaria had failed to sufficiently establish his familiarity with a community similar to Clarksville, reversed the trial court's entry of the defense jury verdict, and remanded for a new trial. In reaching this conclusion, the court stated:

> There is no basis in logic or reason why the testimony of both Dr. Aaron and Dr. DeMaria is not admissible into evidence in this case. We are, however, powerless to do anything other than to engage in the tedious exercise of hair-splitting manifested both in this case and in the recent case of Travis v. Ferraraccio et al., 2005 WL 2277589, No. M2003-00916-COA-R3-CV (Tenn. Ct. App. Sept. 19, 2005). We can only once again follow the lead of the Supreme Court of Tennessee in Robinson, 83 S.W.3d at 723-24, and implore the Legislature to relegate the "similar locality rule" to the "ash heap" of history.

Carpenter, 205 S.W.3d at 484.

In Taylor ex rel. Gneiwek v. Jackson-Madison Cnty. Gen'l Hosp. Dist., 231 S.W.3d 361 (Tenn. Ct. App. 2006), the defendant practiced in Jackson, and the plaintiff's expert practiced in Northeast Georgia. The court found the following summarized proof to be sufficient to qualify the plaintiff's expert, Dr. Harkrider:

> Dr. Harkrider testified that he had conducted research concerning the community of Jackson, Tennessee, including referencing information concerning physicians and medical specialties in Jackson from a 1997 edition of the "Yellow Pages" directory for Jackson[,] Tennessee; reviewing information from the Madison County Chamber of Commerce regarding the community of Jackson, Tennessee; and reviewing information about the Defendant Jackson-Madison County General Hospital.
> . . . .
> . . . Furthermore, Dr. Harkrider also compared the Defendant Hospital with Northeast Georgia Medical Center, based in Gainesville, Georgia, where Dr. Harkrider practiced, and testified as follows:
> Q. . . . Doctor, what – you've mentioned previously that you worked at Northeast Georgia Medical?

A. Yes, sir.

Q. What type of hospital is Northeast Georgia Medical?

A. It's a full service hospital based in Gainesville, Georgia, which is approximately 40 miles north east of Georgia – of Atlanta. It's a tertiary facility. Has all subspecialties, areas of medicine. It has a 20-county catchment area of patients that are referred to it.

Q. Okay. And have you made any comparisons with the work or practice that you have at the Northeast Georgia Medical facility to Jackson-Madison County General Hospital?

A. I have.

Q. And what were the comparisons that you made?

A. The hospitals look fairly similar. They both are referral hospitals. They both have large catchment areas. They both have very busy emergency departments. I think Jackson-Madison County has somewhere around a hundred thousand, a hundred and five thousand. Northeast Georgia is between 75 and 80,000. I see all types of patients, and that would be the similarity.

Id. at 368, 370. The Taylor court, affirming the trial court's qualification of Dr. Harkrider as an expert medical witness, stated that "[a]lthough Dr. Harkrider testified to a national standard of care, it appears . . . that he did in fact rely upon a local standard of care in testifying regarding the duty of care owed to Mr. Taylor in this case, and whether such standard of care was breached." Id. at 372.

In Eckler v. Allen, 231 S.W.3d 379 (Tenn. Ct. App. 2006), the Court of Appeals added a novel and significant layer of analysis to the issue of qualification of medical experts under the locality rule. In Eckler, the trial court disqualified the plaintiff's expert on the grounds that he did not demonstrate sufficient familiarity with the Memphis medical community and the appropriate standard of care in Memphis and granted the defendant summary judgment. The Eckler court analyzed the plaintiff's expert testimony as follows:

In his affidavit, Dr. Huang clearly stated that he was familiar with the standard of care in the Memphis community. Dr. Huang's affidavit and attached spreadsheet also demonstrate that Dr. Huang obtained knowledge of the applicable standard of care by surveying physicians in Tennessee who practice within the specialized field of Mohs micrographic surgery, including the one Mohs micrographics surgeon in Memphis who is not a partner of [defendant] Dr. Allen.

-22-

. . . . Our inquiry becomes, therefore, whether knowledge obtained by surveying physicians who practice in the specialized field in the defendant's community is sufficient under the statute, or whether the statute demands personal, firsthand knowledge.

. . . .

In the case at bar, although Dr. Huang's affidavit and supporting attached documents demonstrated that he has personal knowledge of the standard of care applicable to the specialized field in Birmingham and, arguably, on a national level, there is nothing to indicate personal knowledge of the standard of care applicable in Memphis. Personal is "done in person without the intervention of another." Personal knowledge is "first-hand" knowledge. Dr. Huang's familiarity with the standard of care in Memphis was garnered only through interviewing other physicians in the community; it was not based on any firsthand experience.

Defendants assert that knowledge gained by surveying other physicians and not by personal or firsthand experience is not sufficient under § 29-26-115(a)(1). They submit that a non-expert could survey physicians in a community if the mere collection of data could constitute knowledge. Defendants assert the statute requires personal, firsthand, or direct knowledge of the applicable standard by an expert who practices in the community or in a similar community. We agree.

Id. at 386 (internal citations omitted). Thus, in Eckler, the court for the first time imposed a "personal, firsthand, or direct knowledge" requirement upon an expert, in effect holding that an expert's attempts to educate himself or herself on the standard of care in a community where the expert has not practiced will always fall short, because the expert has not obtained "personal, firsthand, direct" knowledge of the medical community. The court reached this conclusion despite its recognition that, as we observed in Robinson, "in many cases and particularly in cases that involve a board-certified specialty, such as the case now before us, the national standard is representative of the local standard." Eckler, 231 S.W.3d at 387.

Less than a year later, the Western Section of the Court of Appeals again applied the newly-minted "personal, firsthand, direct knowledge" standard to disqualify a medical expert proffered by the defendant hospital. Allen v. Methodist Healthcare Memphis Hosps., 237 S.W.3d 293 (Tenn. Ct. App. 2007). The Allen court stated:

It is undisputed that Dr. VanHooydonk [defendant's expert] practices in Nashville and not in Memphis. Dr. VanHooydonk . . . is a member of the

-23-

faculty at Vanderbilt, and all the hospitals at which he holds privileges are located in Nashville.  However, the Hospital offered no evidence that Nashville is a community similar to Memphis.

We accordingly turn to whether Dr. VanHooydonk demonstrated knowledge of the standard of care applicable to nurses in Memphis hospital practice for the purposes of § 29-26-115(a)(1).  The Hospital asserts Dr. VanHooydonk demonstrated familiarity with the applicable standard of care where he testified that he has interacted with Memphis physicians and nurses at a number of medical lectures and where he taught a continuing medical education in Memphis on timely intervention in obstetrics.  The Hospital asserts that Dr. VanHooydonk's teaching experience regarding intervention in obstetrics makes him particularly qualified to testify in this matter.  Although the Hospital arguably has shown that Dr. VanHooydonk's credentials demonstrate knowledge of an optimum or national standard of care, we agree with Ms. Allen that the Hospital has failed to demonstrate knowledge of the standard of care in Memphis, or in a similar community, for the purposes of the statute.
. . . .
We likewise hold here that Dr. VanHooydonk's discussions with Memphis physicians and nurses at medical lectures does not constitute personal knowledge of the standard of care applicable in Memphis under the section.  We also hold that, although Dr. VanHooydonk's teaching of continuing education classes in obstetric intervention implies knowledge of a national standard of care, it does not demonstrate knowledge of the standard of care in the Memphis community.

Allen, 237 S.W.3d at 296-97.  The court vacated the trial court's judgment entered pursuant to a defense jury verdict and remanded for a new trial.  Id.

Two years after Allen, a panel of the Eastern Section of the Court of Appeals in Farley v. Oak Ridge Med. Imaging, P.C., No. E2008-01731-COA-R3-CV, 2009 WL 2474742, at *10 (Tenn. Ct. App. Aug. 13, 2009), declined to follow the "personal, firsthand, direct knowledge" standard set forth in Eckler and Allen, stating:

We do not believe Eckler went so far as to hold that the bridge of similarity from the community where the expert practices to the community where the defendant doctor practices, must all be built on personal, firsthand knowledge.  There is just too much authority to the contrary that was not even discussed in Eckler.

The Farley court then surveyed and reviewed earlier Tennessee cases where a medical expert had, by various means, educated himself or herself on the characteristics of a defendant's medical community and was allowed to testify in a malpractice case, and concluded:

> Based on the above review, we conclude that the holding in Eckler cannot be extrapolated to require that an expert's comparison of a standard of care in a community in a contiguous state to a standard of care in the community of the alleged malpractice be made solely on the basis of personal knowledge. If the expert is otherwise qualified, it is enough if he or she is actually practicing in some community in a contiguous state, and "connects the dots" between the standard in that community and the community where the alleged malpractice occurred. . . .   Referrals from and interaction with medical providers in neighboring communities, combined with "a comparison of information such as the size, location, and presence [or absence] of teaching hospitals in the two should suffice.

Id. at *11.

Our review of Tennessee Code Annotated section 29-26-115 and pertinent Tennessee case law since 1986 leads us to several conclusions. First, subsection (b) of Tennessee Code Annotated section 29-26-115 sets forth the three requirements for an expert witness to be competent to testify in a medical negligence case. The witness must be (1) "licensed to practice in the state or a contiguous bordering state," (2) "a profession or specialty which would make the person's expert testimony relevant to the issues in the case," and (3) must have "had practiced this profession or specialty in one . . . of these states during the year preceding the date that the alleged injury or wrongful act occurred." Therefore, the only grounds for disqualifying a medical expert as incompetent to testify are (1) that the witness was not licensed to practice in Tennessee, Georgia, Alabama, Mississippi, Arkansas, Missouri, Kentucky, North Carolina, or Virginia; (2) that the witness was not licensed to practice a profession or specialty that would make the person's expert testimony relevant to the issues in the case; or (3) that the witness did not practice this profession in one of these states during the year preceding the date of the alleged injury or wrongful act. Tenn. Code Ann. § 29-26-115(b).

Subsection (a) of Tennessee Code Annotated section 29-26-115 sets forth the three elements a plaintiff must establish to recover in a medical negligence action:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the

-25-

community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

The claimant in most medical negligence cases[9] must provide expert testimony to establish the required elements of subsection (a). Id.; Williams, 193 S.W.3d at 553; Stovall, 113 S.W.3d at 723; Robinson, 83 S.W.3d at 724.

Subsections (a) and (b) serve two distinct purposes. Subsection (a) provides the elements that must be proven in a medical negligence action and subsection (b) prescribes who is competent to testify to satisfy the requirements of subsection (a). Therefore, when determining whether a witness is competent to testify, the trial court should look to subsection (b), not subsection (a).

Any challenge to the admissibility of testimony from a medical expert who is competent to testify under section 29-26-115(b) can be made based on the Tennessee Rules of Evidence. In particular, Tennessee Rules of Evidence 702 and 703 are called into play. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," and Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

---

[9] The exception to this general rule, as already noted, is the "common knowledge" exception. See Seavers, 9 S.W.3d at 92; Bowman, 547 S.W.2d at 530-31.

In describing the function of Rules 702 and 703, we have stated

> that the preliminary question under Tenn. R. Evid. 104 is one of admissibility of the evidence. Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof. After that occurs, a defendant may, of course, challenge the sufficiency of the evidence by moving for a directed verdict at the appropriate times. See Tenn. R. Civ. P. 50. Yet it is important to emphasize that the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact.

McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997) (citation omitted). A trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703.

In its role as a gatekeeper, the trial court is to determine (1) whether the witness meets the competency requirements of Tennessee Code Annotated section 29-16-115(b) and, (2) whether the witness' testimony meets the admissibility requirements of Rules 702 and 703. The trial court is not to decide how much weight is to be given to the witness' testimony. Once the minimum requirements are met, any questions the trial court may have about the *extent* of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility. See Stovall, 113 S.W.3d at 725 (noting that arguments concerning a medical expert's qualifications and competency to testify "take issue primarily with [the expert's] qualifications and the *weight* that should be given his opinions. . . . [t]hese are issues for trial and not for summary judgment") (emphasis in original); Coyle, 822 S.W.2d at 600 ("The objection raised by the defendant [regarding the expert's qualifications and competency] goes more to the weight of the evidence rather than to its admissibility").

In deciding a motion for summary judgment, the trial court does not weigh the evidence, Martin, 271 S.W.3d at 87, but must accept the nonmoving party's evidence as true, id. at 84, and view both the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the nonmoving party. Giggers, 277 S.W.3d at 364; Kelley, 133 S.W.3d at 596. A trial court's failure to properly determine the expert's competency, the admissibility of the expert's testimony, or its failure to view the expert's testimony in the light most favorable to the nonmovant is reversible error. Cf. Stovall, 113 S.W.3d at 721; Searle, 713 S.W.2d at 65 (reversing directed verdict); Bravo, 148 S.W.3d at 363, 369; Wilson, 73 S.W.3d at 104; Church v. Perales, 39 S.W.3d 149, 166-67 (Tenn.

Ct. App. 2000); Ledford, 742 S.W.2d at 648-49.[10] A trial court's decision to accept or disqualify an expert medical witness is reviewed under the abuse of discretion standard. A trial court abuses its discretion when it disqualifies a witness who meets the competency requirements of section 29-16-115(b) and excludes testimony that meets the requirements of Rule 702 and 703. Contrary to statements made in the dissent, Tennessee continues to follow the majority rule and apply the abuse of discretion standard to decisions regarding the admissibility of evidence. This standard remains unchanged by this opinion.

Second, the locality rule requires that the claimant demonstrate "[t]he recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community." Tenn. Code Ann. § 29-26-115(a)(1). The statute does not require a particular means or manner of proving what constitutes a "similar community," nor does it define that term. Principles of stare decisis compel us to adhere to the requirement that a medical expert must demonstrate a modicum of familiarity with the medical community in which the defendant practices or a similar community. Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.

Third, the "personal, firsthand, direct knowledge" standard set forth in Eckler and Allen is too restrictive. There is substantial Tennessee precedent allowing experts to become qualified by educating themselves by various means on the characteristics of a Tennessee medical community. See Stovall, 113 S.W.3d at 723; Searle, 713 S.W.2d at 64-65; Taylor, 231 S.W.3d at 368-71; Pullum v. Robinette, 174 S.W.3d 124, 132-33 (Tenn. Ct. App. 2004); Bravo, 148 S.W.3d at 360-61; Ledford, 645 S.W.2d at 648. A proffered medical expert is not required to demonstrate "firsthand" and "direct" knowledge[11] of a

_____

[10] See also Plunkett v. Bradley-Polk, No. E2008-00774-COA-R3-CV, 2009 WL 3126265, at *6, *8 (Tenn. Ct. App. Sept. 30, 2009); Waterman v. Damp, No. M2005-01265-COA-R3-CV, 2006 WL 2872432, at *7, *18 (Tenn. Ct. App. Oct. 9, 2006); Travis v. Ferraracchio, No. M2003-00916-COA-R3-CV, 2005 WL 2277589, at *5-6 (Tenn. Ct. App. Sept. 19, 2005).

[11] We note that, although there is nothing wrong with requiring an expert's knowledge to be
(continued...)

medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a medical malpractice case. A proffered expert may educate himself or herself on the characteristics of a medical community in order to provide competent testimony in a variety of ways, including but not limited to reading reference materials on pertinent statistical information such as community and/or hospital size and the number and type of medical facilities in the area, conversing with other medical providers in the pertinent community or a neighboring or similar one, visiting the community or hospital where the defendant practices, or other means. We expressly reject the "personal, firsthand, direct knowledge" standard formulated by the Court of Appeals in Eckler and Allen.

Fourth, in this case we do not adopt a national standard of care in medical malpractice cases. Any change in the locality rule must come from the legislature, not the judiciary. However, we recognize that in many instances the national standard is representative of the local standard. Robinson, 83 S.W.3d at 724; see also Pullum, 174 S.W.3d at 129-30. A number of medical experts have testified in Tennessee cases that there is either a uniform national standard of care or a standard pertinent to a broad geographic area applicable to medical care providers. Examples of such testimony are found in Stovall, 113 S.W.3d at 719; Robinson, 83 S.W.3d at 721; Taylor, 231 S.W.3d at 371-72; Carpenter, 205 S.W.3d at 479-80; Pullum, 174 S.W.3d at 131-32; Kenyon, 122 S.W.3d at 762; Totty, 121 S.W.3d at 678; Wilson, 73 S.W.3d at 99; Mabon, 968 S.W.2d at 828; Coyle, 822 S.W.2d at 598; and Ayers, 689 S.W.2d at 159.[12]

Therefore, expert medical testimony regarding a broader regional standard or a national standard should not be barred, but should be considered as an element of the expert witness' knowledge of the standard of care in the same or similar community. Contrary to statements made in the dissent, this recognition is neither a dilution nor a relaxation nor an invitation of reliance on a national or regional standard of care. It is simply a common sense recognition of the current modern state of medical training, certification, communication, and information sharing technology, as demonstrated in the numerous instances of sworn testimony offered by medical experts in the above-reviewed cases, as well as the thoughtful analysis and discussion by courts in several other jurisdictions, that the consideration of such

_____

[11](...continued)
"personal," as a semantic matter such a requirement adds nothing to the analysis. Although philosophers may debate the point, for legal and practical purposes all knowledge possessed by a person, however obtained, is "personal" knowledge.

[12] See also Johnson v. Richardson, 337 S.W.3d 816 (Tenn. Ct. App. 2010); Farley, 2009 WL 2474742, at *12; Travis, 2005 WL 2277589, at *9; Sandlin v. Univ. Med. Ctr., No. M2001-00679-COA-R3-CV, 2002 WL 1677716, at *6 (Tenn. Ct. App. July 25, 2002).

testimony is justified.  See, e.g., Shilkret v. Annapolis Emer. Hosp. Ass'n, 349 A.2d 245 (Md. 1975); Brune v. Belinkoff, 235 N.E.2d 793 (Mass. 1968); Hall v. Hilbun, 466 So.2d 856 (Miss. 1985).

Only after a medical expert witness has sufficiently established his or her familiarity with the standard of care in the same or similar community as the defendant, may the witness testify that there is a national standard of medical care to which members of his or her profession and/or specialty must adhere.  This testimony, coupled with the expert's explanation of why the national standard applies under the circumstances, is permissible and pertinent to support the expert's opinion on the standard of care.  The mere mention of a national standard of care should not disqualify an expert from testifying.  However, an expert may not rely solely on a bare assertion of the existence of an applicable national standard of care in order for his or her proffered testimony to be admissible under Rules of Evidence 702 and 703.

In summary, (1) at the summary judgment stage of the proceedings, trial courts should not weigh the evidence but must view the testimony of a qualified expert proffered by the nonmoving party in the light most favorable to the nonmoving party.  (2) A claimant is required to prove the "[t]he recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community."  Tenn. Code Ann. § 29-26-115(a)(1).  The medical expert or experts used by the claimant to satisfy this requirement must demonstrate some familiarity with the medical community in which the defendant practices, or a similar community, in order for the expert's testimony to be admissible under Rules 702 and 703.  Generally, a competent expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has had discussions with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as admissible. (3) A medical expert is not required to demonstrate "firsthand" and "direct" knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a medical malpractice case.  A proffered expert may educate himself or herself on the characteristics of a medical community in a variety of ways, as we have already noted. (4) In addition to testimony indicating a familiarity with the local standard of care, a medical expert may testify that there is a broad regional standard or a national standard of medical care to which members of his or her profession and/or specialty must adhere, coupled with the expert's explanation of why the regional or national standard applies under the circumstances.

### Qualification of Expert Witnesses Dr. Rerych and Dr. Shaw

We now turn to an application of the above-discussed principles to the testimony of the two proffered medical experts in the present case, Dr. Rerych and Dr. Shaw. Dr. Rerych's curriculum vitae was included in the record. Dr. Rerych has been licensed to practice medicine in North Carolina since 1986 and has practiced in Asheville as a general, vascular and noncardiac thoracic surgeon since 1988. He is board-certified in general surgery. Dr. Rerych testified that he had traveled to Nashville to testify as a medical expert once or twice before, and had testified in the Tennessee Tri-Cities area on one previous occasion. According to Dr. Rerych's testimony, he had been previously qualified to provide medical expert testimony in Tennessee and did so testify on two or three earlier occasions. Dr. Rerych testified that he had traveled to Nashville on several occasions and once toured one of the community hospitals there. He also testified that he reviewed demographic information about Nashville, Davidson County, the hospitals and medical facilities in Nashville, and Summit Medical Center where Dr. Williams practices, which he considered in forming his opinion that Asheville is a similar community to Nashville "as it applies to the facts and circumstances of this case," although he also admitted he did not do any research on and was not familiar with the characteristics of Summit Hospital.

During his deposition, Dr. Rerych and defense counsel engaged in a semantical battle typical in a medical malpractice case where defense counsel tries to elicit testimony that will support an argument that the expert relied on a national standard of care, and where the expert may genuinely believe in an applicable national standard under the circumstances but is concerned that saying so will result in his disqualification:

> Q: Do you know if [Summit Hospital is] at all similar to the hospital in your community?
> A: It most likely is.
> Q: How do you know that?
> A: How do I know that? Because I've been to that area before, and in addition we have the same I wouldn't say overall systems, but the hospitals are the same. We have acute beds. We have general surgeons and so on who take care of these patients who come through.
> . . . .
> Q: Do you have an opinion as to whether or not the standard of care in Asheville, North Carolina, is the same or similar to the standard of care in Nashville or Hermitage, Tennessee?
> A: It is.
> . . . .
> Q: How do you know that? What's the basis for that opinion?

A: I've been there before in terms of the Nashville vicinity, and I've testified in Nashville.

Q: I know you've testified there, but what's the basis for your opinion that you see the same number of patients?

A: Not the same number. It might be different numbers. But they're similar communities.

Q: How are they similar?

A: We see the same types of patients.

Q: How do you know that?

A: Because Crohn's disease I see here. Ulcerative colitis I see here. That's how I know. I mean that was not the case of an exotic problem.

. . . .

Q: Would you say the standard of care is the same all over the United States for surgery?

A: Not necessarily, no. But the bottom line is we're looking at similar communities.

Q: Well, how are the communities of Nashville and Asheville the same?

A: We see the same patients. The medical doctors are similar in terms of their training and experience.

Q: You don't have any firsthand knowledge of practicing medicine in Hermitage or Nashville, do you?

A: I don't have any firsthand knowledge, but on the other hand, medicine is medicine; diseases are diseases; training is similar.

Q: Medicine is medicine. So you're saying the standard of care is the same in Columbus, Ohio, as it is in Asheville, North Carolina?

A: I'm saying that there [are] standards of care which are similar, governed by similar training, similar experience, similar education in similar communities.

Q: Regardless of where you are?

A: That's correct. But not a national standard of care. I'm not going to get off into that stuff.

. . . .

Q: Well, would you agree that the standard of care in Sacramento, California, is the same as Asheville, North Carolina?

A: Given the similar circumstances, perhaps.

. . . .

Q: Okay. And the question is do you believe that the standard of care in Sacramento, California, is the same as that in Asheville, North Carolina?

A: I don't understand your question.

. . . .

-32-

Q: What is the basis for you having knowledge as to the standard of care in Sacramento, California?

A: Sacramento, California, has nothing to do with this case. I don't want to answer that question.

Q: Well, I'm going to ask for sanctions.

We have carefully reviewed Dr. Rerych's testimony and credentials and conclude that Dr. Rerych sufficiently established his familiarity with the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community. Consequently, the trial court erred in holding him disqualified to render an expert medical opinion in this case.

Regarding Dr. Shaw's testimony and qualifications, the Court of Appeals stated only the following:

> The trial court first found that Dr. Shaw, an emergency room physician, failed to meet the requirements of Tenn. Code Ann. § 29-26-115 since he did not practice the appropriate speciality, *i.e.*, surgery. Based upon the abuse of discretion standard, we cannot disagree that an emergency room physician's opinion is not helpful in determining whether a surgeon committed malpractice.

Shipley, 2009 WL 2486199, at *5. This statement appears to comport with reason and common sense on its face, and we would be inclined to agree if the issues in this case pertained to surgery. But Tennessee Code Annotated section 29-26-115(b) provides that "[n]o person in a health care profession requiring licensure . . . shall be competent to testify . . . unless the person was licensed to practice in the state or a contiguous bordering state *a profession or specialty which would make the person's expert testimony relevant to the issues in the case . . .*" (Emphasis added).

Our courts have recognized on a number of occasions that section 29-26-115 "contains no requirement that the witness practice the same specialty as the defendant." Searle, 713 S.W.2d at 65 (holding that the witness was competent to testify regarding "the applicable standards of surgeons in the prevention and treatment of surgical wound infections . . . even though he was not himself a surgeon"); Cardwell v. Bechtol, 724 S.W.2d 739, 751 (Tenn. 1987) (statute does not require witness to practice same specialty as defendant, but "the witness must demonstrate sufficient familiarity with the standard of care and the testimony must be probative of the issue involved"); Pullum, 174 S.W.3d at 142; Church, 39 S.W.3d at 166 n.17; Ledford, 742 S.W.2d at 647. Consequently, courts must look carefully at the particular issues presented in the case to determine if an expert practices a profession or specialty that would make the expert's testimony relevant to those

issues. In this case, Dr. Shaw, a physician board-certified in emergency medicine who had practiced medicine for 33 years, testified that he was familiar with the standard of care applicable to a surgeon for the limited area of the standard of communication between a referring doctor and an emergency room doctor, and the apportionment of responsibility for deciding whether the patient should be admitted, and how, when, and by whom a patient should receive follow-up care. As noted, the issues in this case regarding allegations of Dr. Williams' negligence do not pertain to surgery performed by Dr. Williams or related surgical care, but rather whether Dr. Williams provided appropriate and timely follow-up care under the circumstances presented, including Mrs. Shipley's medical condition at the time she presented to the emergency room the first time. Dr. Shaw was thus qualified to testify as an expert because his testimony was probative and relevant to the issues and allegations presented in Mrs. Shipley's lawsuit.[13]

**Conclusion**

We reverse the trial court's judgment that Dr. Rerych and Dr. Shaw were not qualified to render expert medical opinions pursuant to Tennessee Code Annotated section 29-26-115. Regarding Mrs. Shipley's claim based on failure to admit to the hospital on November 18, 2001, Dr. Williams successfully affirmatively negated an element of that claim – breach of the applicable standard of care – by pointing to the testimony of Drs. Rerych and Shaw that the failure to admit was not a breach of the appropriate standard of care. We reverse the judgment of the Court of Appeals in part and reinstate summary judgment in Dr. Williams' favor on the failure to admit claim. Because Dr. Williams failed to either affirmatively negate an essential element of Mrs. Shipley's remaining claims, or show that Mrs. Shipley cannot prove an essential element of her claims at trial, the burden did not shift to Mrs. Shipley to demonstrate a genuine issue of material fact, and summary judgment in Dr. Williams' favor was improperly granted. We therefore vacate the court's order granting summary judgment and remand the case for trial. Costs on appeal are assessed to the appellant, Dr. Robin Williams.

_____
SHARON G. LEE, JUSTICE

---

[13] Although there is no indication in the record or the trial court's order that it found Dr. Shaw to be disqualified because of the locality rule, we note that Dr. Shaw's testimony was sufficient to establish his familiarity with the recognized standard of acceptable professional practice in Nashville or a similar community under the principles and standards discussed herein.