IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 11, 2025 Session

**GLADYS CLAIRE BOWEN v MICHAEL W. NELSON, M.D., ET AL.**

**Appeal from the Circuit Court for Obion County**
**No. CC-22-CV-41   Jeff Parham, Judge**
_____

**No. W2024-00749-COA-R3-CV**
_____

Plaintiff appeals the trial court's decision to exclude the testimony of her proffered expert for failure to comply with the locality rule. Plaintiff also appeals the grant of summary of judgment based on the exclusion of that expert. Finding the trial court did not abuse its discretion in excluding the testimony, we affirm that ruling. Additionally, we affirm the trial court's decision to grant summary judgment as the excluded testimony was the only evidence offered regarding the applicable standard of care.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

W. Lewis Jenkins Jr., Charles M. Agee, Jr., Dyersburg, Tennessee, for the appellant, Gladys Claire Bowen.

Joseph M. Clark, Samantha E. Bennett, Memphis, Tennessee, for the appellees, Gregory Carl Bruno, M.D., and Jackson Radiology Associates, P.A.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Ms. Gladys Bowen, the appellant, arrived at the emergency department of Baptist Memorial Hospital in Union City, Tennessee, at approximately 12:46 P.M. on September 8, 2018, complaining of severe pain in her right leg and lower back.[1] Shortly after arriving,

---

[1] This appeal arises from a grant of summary judgment. Accordingly, this recitation of facts is taken from the pleading documents and pre-trial discovery materials contained in the record.

she was examined by Dr. Michael Nelson, who ordered certain tests be performed. It appears that, after reviewing the results of these tests and Ms. Bowen's other medical information, Dr. Nelson contacted physicians at Jackson-Madison County General Hospital ("JMCGH") in Jackson, Tennessee, and Baptist Memorial Hospital – East in Memphis, Tennessee, to discuss Ms. Bowen's condition. As a result of these conversations, it was determined that Ms. Bowen needed to be transferred to another facility for treatment, but those physicians refused transfer of Ms. Bowen to their facilities. Dr. Nelson later spoke with Dr. Gregory Bruno, another physician at JMCGH and one of the appellees in this matter, who accepted the transfer of Ms. Bowen. At approximately 4:09 P.M., Ms. Bowen was transported by ambulance from Baptist Memorial in Union City to JMCGH. She arrived at approximately 5:05 P.M. and was examined in the emergency department. Dr. Bruno consulted on the matter and determined that JMCGH was unable to treat Ms. Bowen's condition and thus recommended she be transferred to another facility. Thereafter, Ms. Bowen was transported to Methodist University Hospital in Memphis, Tennessee, arriving at approximately 11:30 P.M. Ms. Bowen was treated and underwent various surgical procedures, but doctors were eventually required to amputate her right leg above the knee.

Ms. Bowen filed the first complaint in this matter on December 20, 2019. It appears that the parties engaged in some amount of discovery, as Dr. Nelson and Dr. Bruno were deposed. However, the lawsuit was voluntarily non-suited without prejudice by a court order dated December 9, 2021.[2] Ms. Bowen filed pre-suit notice on January 7, 2022, and filed the present medical negligence action on May 31, 2022. In the complaint, Ms. Bowen alleged medical negligence against Dr. Nelson, Dr. Bruno, and Jackson Radiology Associates, PA, (Dr. Bruno's employer and the second appellee in this matter), for various allegedly negligent acts which she alleged occurred over the course of her treatment. Dr. Bruno and Jackson Radiology filed their respective answers to the complaint on July 7, 2022.[3]

On January 23, 2023, Ms. Bowen filed her Rule 26 Expert Disclosures, in which she expressed her intention to offer the testimony of Dr. Jeffery Jim "on the recognized standard of care of acceptable professional practice required of a specialist receiving transfer requests from another hospital or facility practicing in Jackson, Tennessee or a similar community during the twelve (12) months preceding September 8, 2018." She also stated her intention to offer the testimony of Dr. Jim on causation as to all the defendants. The parties engaged in discovery, and Dr. Jim was deposed on March 6, 2023.

In this deposition, Dr. Jim was initially questioned by an attorney for one of the

---

[2] The present complaint states that this order was entered "[o]n December 9, 2001." A copy of the order is not contained in our record, but based on the other dates in this action, it appears Ms. Bowen intended to list December 9, 2021, as the date of entry, rather than December 9, 2001. The appellees have not raised any issue with the statute of limitations in this matter.

[3] Dr. Nelson's answer is not contained in the record.

defendants. He explained that he was at that time working at a hospital in Minneapolis, Minnesota, but he had spent many years working at a hospital in St. Louis, Missouri, which is where he was practicing when the events leading to the lawsuit took place. Dr. Jim was asked whether there was anything he "looked up" when he received Ms. Bowen's records, and he responded he reviewed the locations of the places involved as he was not familiar with Tennessee. He further stated that he used the website "Google Maps" to look at the locations of Union City and JMCGH in relation to Memphis. He was later asked more specifically about his knowledge of Jackson. He first stated that "Jackson is in Tennessee. It's probably about [ ] I would say - - as far as I know, I think it's a little bit more [ ] - - not as urban, more suburban, rural area." Dr. Jim went on to say that Jackson was "probably about an hour, hour and a half or so, I think, away from Memphis to the northeast of Memphis, if I remember correctly," but he did not "know [Jackson's] population size per se." Dr. Jim was then asked to explain everything he knew about JMCGH, and he stated, "It's a hospital. That's where in this particular case, you know, Ms. Bowen got some of her treatment." When asked whether he knew anything else about JMCGH, Dr. Jim responded, "No. Sorry." Later, Dr. Jim was asked whether he had ever spoken to any physicians who practiced at JMCGH and explained that he had not. He also stated that he did not know what services were available at JMCGH in 2018. Subsequently, Dr. Jim testified that he had never practiced in Jackson, seen patients in Jackson, or worked with physicians in Jackson. Similarly, Dr. Jim indicated that he had not inquired into the practices of physicians who accepted patients from other hospitals in Jackson in 2018 and he had never discussed the standard of care in Jackson with any Jackson physicians. Dr. Jim was asked whether he had ever been to Jackson and stated that he had been to Memphis and he "may have driven by [Jackson], but certainly [had] not spent any time [there]." Dr. Jim also indicated that he had never been to any hospitals in Jackson and had not lectured there. Dr. Jim was then asked this question: "You don't have personal knowledge of the standard of care for physicians in Jackson, do you?" He responded, "I've never been down there, correct."

However, when later questioned by the plaintiff's attorney, Dr. Jim was asked whether he "had covered smaller hospitals in [his] career" and responded that he had. He stated that early in his career he worked at a hospital in St. Louis, Missouri, and explained in his current position he received referrals from smaller hospitals. Subsequently, Dr. Jim was asked whether he was "familiar with hospitals similar to Jackson-Madison County General Hospital?" Dr. Jim responded by stating simply, "Yes." Dr. Jim was then asked whether there would be overlap with local and national standards of care and he stated, "I think so." Dr. Jim was also asked the following question: "I think you testified, that you've looked at Google Maps and looked at population and became familiar with the population and demographics of communities such as Union City and Jackson. Is that correct?" Dr. Jim responded, "Right. Having [ ] lived in the middle of the country, I think it's not that they're all the same -- sorry -- but a lot of the -- the geography is very similar." When being re-examined by the defendants' attorney, Dr. Jim was asked whether his familiarity with the local standard of care was "based on [his] comparison of hospitals where [he had]

worked [and] with [JMCGH?]" Dr. Jim responded, "Right. I think it's [ ] hospitals I've worked with. And [ ] the one I worked at wasn't purely rural, but it's sort of smaller in the city, but northern edges." Counsel then asked Dr. Jim, "How many beds does [JMCGH] have?" Dr. Jim responded, "I don't know exactly." Counsel then asked Dr. Jim how he could "compare [JMCGH] to hospitals [he had] worked in if [he did not] know how many beds Jackson [General] [had]." Dr. Jim said he believed "the crux of this discussion" was that "you don't have a big enough hospital that covers everything." He further stated, "[s]ome of them are going to be a hundred beds; some of them are going to be 200 beds; some of them are going to be 300. . . . So, I don't think if it's a 100-bed hospital it should be very different than a 200-bed hospital." Dr. Jim was then asked again how many beds JMCGH contained to which he responded, "I don't know. I would probably say in the range of a couple hundred, maybe, or less than that." He reaffirmed that he was unaware of the population of Jackson, stated he was unaware of other medical facilities or hospitals in Jackson in 2018, and stated he did not know what medical services or specialized practices were available in Jackson in 2018. This concluded Dr. Jim's deposition.

On December 20, 2023, Dr. Bruno and Jackson Radiology filed a motion to exclude Dr. Jim's testimony on the standard of care pursuant to Tennessee Rule of Civil Procedure 56, with a memorandum of law attached. This motion asserted that Dr. Jim's testimony "failed to satisfy the locality rule" and thus was inadmissible.[4] Attached to the memorandum was information obtained from JMCGH demonstrating that in 2018, it had 642 beds.[5] Later that day, Dr. Nelson joined Dr. Bruno and Jackson Radiology to file a joint motion to exclude Dr. Jim's testimony on causation. The defendants also filed a joint motion for summary judgment the same day. The motion asserted that the record was "devoid of admissible expert proof to establish (1) the standard of care applicable to Defendants, (2) that the Defendants breached the standard of care applicable to them, and (3) that, but for the alleged negligence of the Defendants, the Plaintiff suffered an injury that otherwise would not have occurred." Accordingly, the defendants argued there was no issue of material fact pertaining to those essential elements. The parties engaged in extensive briefing, and a hearing was held on the motions on March 27, 2024. The parties presented their arguments, and the trial court announced that it would grant the motions to exclude Dr. Jim's testimony as to the standard of care based on the failure to satisfy the locality rule. As a result, there was no proof establishing the standard of care. As the standard of care is an essential element of a medical negligence claim, the trial court also stated that this omission rendered the case appropriate for summary judgment in favor of the defendants. The trial court also denied a request from Ms. Bowen to continue the case

---

[4] As the Tennessee Supreme Court has explained, "the locality rule requires that the claimant [in a medical negligence claim] demonstrate '[t]he recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community.'" *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011) (quoting Tenn. Code Ann. § 29-26-115(a)(1)).

[5] The trial court stated that it relied on the defendants' memorandum of law and "the entire record in this cause" when it determined the testimony was inadmissible. Thus, it appears that this document was considered though not specifically referenced in the final order.

- 4 -

in order to designate additional expert witnesses.

The trial court memorialized its ruling in a written order entered April 23, 2024. In that order, the trial court granted the motion to exclude Dr. Jim's testimony based on Rules 702 and 703 of the Tennessee Rules of Evidence because Dr. Jim did not satisfy the locality rule. The order noted that "Dr. Jim did not review any data about Jackson, Tennessee, the community in which Dr. Bruno practices, or Jackson-Madison County General Hospital, the hospital where Dr. Bruno was involved in the Plaintiff's care." The order also noted that Dr. Jim did not know Jackson's population, the number or types of medical facilities in Jackson, or the medical services available in Jackson in 2018. The trial court highlighted Dr. Jim's statement that his only knowledge of Jackson was it is approximately an hour and a half northeast of Memphis, and is more suburban and rural than urban. The trial court also relied on Dr. Jim's testimony that he never worked with any physicians in Jackson, did not inquire about the practices in the area in 2018, and had never visited Jackson or JMCGH. The trial court entered an additional order granting the joint motion for summary judgment the same day. This motion applied to each of the defendants and was predicated on the motions to exclude being granted and thus, no expert proof having been admitted on the standard of care. Ms. Bowen has appealed only the exclusion of Dr. Jim's testimony and the grant of summary judgment as to Dr. Bruno and Jackson Radiology.

## II. Issues Presented

Ms. Bowen has presented the following issues on appeal, which we have slightly reframed:

1. Whether the trial court abused its discretion when it omitted the expert testimony of Dr. Jeffery Jim for failure to satisfy the locality rule.
2. Whether the trial court erred when it granted summary judgment in the appellees' favor.

For the following reasons, we affirm the judgment of the trial court.

## III. Discussion

The issues presented by Ms. Bowen are interrelated, as the grant of summary judgment was based upon the decision to exclude Dr. Jim's testimony. The exclusion of Dr. Jim's testimony raises a question of expert witness admissibility; thus, it is reviewed using an abuse of discretion standard. *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011); *Jackson v. Thibault*, No. E2021-00988-COA-R3-CV, 2022 WL 14162828, at *3 (Tenn. Ct. App. Oct. 25, 2022); *Ray v. S. Tennessee Med. Ctr., LLC*, No. M2012-01227-COA-R3-CV, 2013 WL 3282927, at *1 (Tenn. Ct. App. June 25, 2013). As we have previously stated, "[a] trial court's failure to properly determine the expert's competency,

the admissibility of the expert's testimony, or its failure to view the expert's testimony in the light most favorable to the nonmovant is reversible error." *Shipley*, 350 S.W.3d at 551. "A trial court abuses its discretion when it . . . excludes testimony that meets the requirements of [Tennessee Rules of Evidence] 702 and 703. *Id.* at 552.

Conversely, the decision to grant or deny "a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness." *Thibault*, 2022 WL 14162828 at *3. Our state rules of civil procedure provide that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The moving party has the burden of proving that its motion satisfies these requirements." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000). To prove the motion satisfies these requirements, "the moving party must either affirmatively negate an essential element of the nonmoving party's claim or show that the nonmoving party cannot prove an essential element of the claim at trial." *Mershon v. HPT TA Props. Tr.*, No. M2023-01334-COA-R3-CV, 2024 WL 4471404, at *4 (Tenn. Ct. App. Oct. 11, 2024), *appeal denied* (Mar. 13, 2025) (citing *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008)).

In a medical negligence action, the claimant has the burden of proving the following elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a)(1)-(3). Thus, "[i]n evaluating an expert, the trial court must also consider the requirements of the locality rule." *Thibault*, 2022 WL 14162828 at *4 (citing *Shipley*, 350 S.W.3d at 551). "[T]he locality rule requires that the claimant demonstrate '[t]he recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community.'" *Shipley*, 350 S.W.3d at 552 (quoting Tenn. Code Ann. § 29-26-115(a)(1)). To satisfy this rule, "a medical expert must demonstrate a modicum of familiarity with the medical community in which the defendant practices or a similar community." *Id.* *Shipley* also provides three methods by which a medical expert may demonstrate that he or she has a modicum of familiarity with a particular community or a similar one. *Id.* First, the expert may testify "that he or she has reviewed and is familiar with pertinent statistical information such as

community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area." *Id.* Second, the expert may testify that he or she "has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented." *Id.* Third, the expert may testify that he or she "has visited the community or hospital where the defendant practices." *Id.* Notably, this requirement does not require a medical expert to have "firsthand" or "direct" knowledge of the medical community and the appropriate standard of care in the community in order to qualify as competent to testify. *Id.* Similarly, the locality rule does not forbid an expert from testifying regarding a national standard of care. *Id.* at 553. Rather, the expert must first establish "his or her familiarity with the standard of care in the same or similar community as the defendant" before that witness may "testify that there is a national standard of medical care to which members of his or her profession and/or specialty must adhere." *Id.*

The elements above must generally "be proven through the testimony of a qualified expert witness." *Young v. Frist Cardiology, PLLC*, 599 S.W.3d 568, 571. (Tenn. 2020) (citing *Shipley*, 350 S.W.3d at 550).[6] Subsection (b) identifies those who are competent to serve as qualified expert witnesses in medical negligence cases, stating that:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. . . . The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115(b). However, competency under subsection (b) "is not the only requirement for admissibility. Instead, the expert must still meet the admissibility requirements of Rules 702[7] and 703[8] of the Tennessee Rules of Evidence." *Thibault*,

---

[6] An exception to this general rule is referred to as the "common knowledge" exception. *Shipley*, 350 S.W.3d at 550 n.9. This exception permits jurors to infer negligence in circumstances typically involving "unusual injuries such as a sponge or needle being left in the patient's abdomen following surgery or where the patient's eye is cut during the performance of an appendectomy." *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999). This exception has not been raised in the present action.

[7] Rule 702 states: "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

[8] Rule 703 states: "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,

2022 WL 14162828 at *3.  "Thus, '[i]n its role as a gatekeeper, the trial court is to determine (1) whether the witness meets the competency requirements of Tennessee Code Annotated section 29-16-115(b) and, (2) whether the witness' testimony meets the admissibility requirements of Rules 702 and 703.'"  *Id.* (quoting *Shipley*, 350 S.W.3d at 551).

We now turn our focus to consider the expert testimony at issue and whether the trial court abused its discretion when it determined the testimony did not comply with the principles espoused above.  Neither party disputes that Dr. Jim met the competency standards set out in Tennessee Code Annotated section 29-26-115(b).  Rather, the parties dispute whether Dr. Jim's testimony satisfied the admissibility requirements of the locality rule and by extension, Rules of Evidence 702 and 703.  Ms. Bowen appears to acknowledge that Dr. Jim did not testify in accordance with the methods of satisfying the locality rule set out in *Shipley*.  This is confirmed by the record.  Dr. Jim did not testify that he had reviewed any of the relevant demographic data pertaining to Jackson, but rather, stated multiple times he did not know the population of Jackson.  Likewise, he stated that he was unaware of the number of medical facilities and services in the community.  Further, when asked about the number of beds in JMCGH, Dr. Jim stated, "I don't know. I would probably say in the range of a couple hundred, maybe, or less than that."  This appears to have been incorrect speculation as the defendants submitted a document in support of their motion to exclude which indicated on June 11, 2018, JMCGH had 642 beds.  Second, when asked if he had discussed the standard of care in Jackson with a physician from Jackson or a neighboring community, Dr. Jim specifically stated that he had not done so.  Finally, when asked whether he had visited either Jackson, Tennessee or JMCGH, Dr. Jim stated that he had never been to either.

However, Ms. Bowen does contend that Dr. Jim satisfied the locality rule through a novel method of establishing familiarity with a similar community.  She asserts that "relevant experience constitutes an independent basis for establishing similarity" of communities.  Ms. Bowen further avers that Dr. Jim satisfied the locality rule by demonstrating "extensive personal familiarity with the specific context in which Dr. Bruno rendered care to Ms. Bowen" and this knowledge "form[ed] an adequate basis for his testimony as to the local standard of care in this case."

Ms. Bowen supports this theory with several arguments.  She first asserts that "[s]tatutory interpretation tools show that review of demographic data constitutes one non-exclusive method" of complying with the locality rule but there are others.  Additionally,

---

the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."  Tenn. R. Evid. 703

she contends that while the review of such data is the usual method of establishing familiarity with a similar community, a demonstration of "relative experience of a professional at a particular juncture within the overall health care delivery system should be an alternative method of complying with the requirements imposed by §29-26-115(a)." She supports this claim with the dictionary definition of the word "similar" which she defines as "comparable" and claims that "the context in which the care is offered" demonstrates a "relevant similarity." Ms. Bowen also points to Dr. Jim's experience in providing vascular care to patients and in the transfer of patients from one hospital to another and argues that this experience "gave him a logical and practical basis for his testimony as to the standard of care incumbent upon Dr. Bruno[.]" Ms. Bowen also contends that Dr. Jim's assertion that he was familiar with vascular treatment and transferring patients from smaller to larger hospitals made him competent to testify because he "based his opinions on his personal experience working in the very same context within the health care delivery system" which Dr. Bruno was working in when he rendered care to Ms. Bowen. Ms. Bowen also points to Dr. Jim's testimony that he gained this knowledge by working "at smaller 'suburban' hospitals and receiving patients referred for care at larger urban hospitals" and contends this "demonstrated his medical familiarity to the position within the health care delivery system of hospitals just like Union City, Tennessee, and Jackson, Tennessee."

To begin, Ms. Bowen is correct in her assertion that a witness's testimony he or she has reviewed demographic data does not constitute the only method of satisfying the locality rule. As set out above, *Shipley* provides three types of testimony which satisfy the locality rule. 350 S.W.3d at 552. We would also note that Ms. Bowen appears to be correct in stating no case has held the *Shipley* methods to be the exclusive methods of satisfying the locality rule, though, Tennessee courts have consistently applied them in these matters. *Thibault*, 2022 WL 14162828 at *4; *Evans ex rel. Evans v. Williams*, No. W2013-02051-COA-R3-CV, 2014 WL 2993843, at *7-8 (Tenn. Ct. App. June 30, 2014); *McDonald v. Shea*, No. W2010-02317-COA-R3-CV, 2012 WL 504510, at *10 (Tenn. Ct. App. Feb. 16, 2012); *Meares v. Traylor*, No. E2011-02187-COA-R3-CV, 2012 WL 3060510, at *5-6 (Tenn. Ct. App. July 27, 2012). Conversely, Ms. Bowen has not cited any cases in which an expert's "relevant experience" constituted a basis for establishing knowledge of a community or similar community. However, whether the *Shipley* methods are the exclusive methods of satisfying the locality rule is irrelevant to the dispensation of the present matter as Ms. Bowen's proposed "relevant experience within the healthcare system" method does not address the locality rule's function of ensuring a medical expert "demonstrate[s] a modicum of familiarity with the medical community in which the defendant practices or a similar community." *Shipley*, 350 S.W.3d at 552.

Dr. Jim's experience within the health care system does not demonstrate any level of familiarity with Jackson or a similar community. We fail to see the connection between Dr. Jim's experience in the health care system and knowledge of Jackson or a similar community. This type of experience is certainly a relevant consideration for the

competency of a witness in this type of case, but the locality rule is separate from the competency requirements of Tennessee Code Annotated section 29-26-115(b). *See Thibault*, 2022 WL 14162828 at *3. None of the experience Dr. Jim testified to indicates that he had the knowledge of Jackson or a similar community necessary to comply with the locality rule. During his deposition, Dr. Jim was asked whether he was "familiar with hospitals similar to Jackson-Madison County General Hospital?" Dr. Jim responded by stating simply, "Yes." However, this claim was unsupported by his own testimony and was merely a bare assertion of familiarity. Dr. Jim did not explain how the hospital he worked at in St. Louis, Missouri at the beginning of his career was similar to JMCGH. Likewise, he failed to describe the equipment or staff available in JMCGH or to demonstrate that the resources available at JMCGH were similar to those available at the hospital he claimed was similar. *See Evans*, 2014 WL 2993843, at *10 (determining that a medical expert demonstrated knowledge certain medical communities were similar despite a large difference in population in the two areas because "the facilities and equipment available in each community would be a more relevant inquiry than the population"). Additionally, any of Dr. Jim's testimony describing his knowledge of JMCGH demonstrated a lack thereof and rendered any comparison he intended to make inefficacious. It is unclear how Dr. Jim could have determined that a community or hospital he worked in was similar to Jackson or JMCGH, when he did not demonstrate that he had a benchmark knowledge for either comparison. *See Thibault*, 2022 WL 14162828 at *8 (stating that "[w]ithout an attempt to familiarize himself with the locality before forming his opinions, it [was] difficult to discern how [the medical expert] could [have concluded] that the local standard [was] synonymous with the national standard, as required under *Shipley*"). For example, when asked about the number of beds in JMCGH, Dr. Jim speculated that it was "in the range of a couple hundred, maybe, or less than that." This speculation was incorrect as impeachment information provided by the appellees indicated there were approximately 642 beds in JMCGH in 2018 when the events leading to this lawsuit occurred. This demonstrates that Dr. Jim did not have an adequate knowledge of JMCGH to determine whether it was a hospital similar to one in which he had worked.

Therefore, we cannot say the trial court abused its discretion when it excluded Dr. Jim's testimony. There is no evidence contained in the record demonstrating that Dr. Jim satisfied the locality rule by testifying of the requisite knowledge of Jackson or a similar community. Ms. Bowen seems to acknowledge that Dr. Jim's testimony did not satisfy the methods of establishing familiarity set out in *Shipley*, and there is nothing in the record indicating that Dr. Jim established a modicum of familiarity with Jackson or a similar community through an alternative method not contemplated in *Shipley*. 350 S.W.3d at 552. Dr. Jim's experience in the health care system is certainly important to his competency as a witness and the relevance of his proffered testimony, but the experience itself is not tethered to any knowledge of Jackson or a similar community and thus the trial court properly found it to be inadmissible.

Having determined the trial court did not abuse its discretion when it excluded the testimony of Dr. Jim, we further conclude that the trial court did not err when it granted summary judgment in favor of the appellees. The summary judgment motion was predicated on the lack of evidence in the record regarding the standard of care applicable in this action. Ms. Bowen only sought to enter proof of the standard of care applicable to Dr. Bruno and Jackson Radiology through Dr. Jim's testimony. As Dr. Jim's testimony was properly excluded from the record, there is no proof of the applicable standard of care contained in the record. Therefore, an essential element of the claim was not established as to both appellees, and we accordingly affirm.

## IV. Conclusion

Because the locality rule was not satisfied, the trial court did not abuse its discretion when it excluded Dr. Jim's expert testimony. Therefore, the trial court also did not err by granting summary judgment as no proof was admitted pertaining the requisite standard of care in this medical negligence action. Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the appellant, Ms. Gladys Claire Bowen, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE