IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2025

**STATE OF TENNESSEE v. JOSHUA TERELLE GAINES**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-C-2068    Steve R. Dozier, Judge**

_____

**No. M2022-01178-CCA-R3-CD**

_____

The Defendant, Joshua Terelle Gaines, was convicted in the Davidson County Criminal Court of first degree felony murder, second degree murder, especially aggravated robbery, and being a felon in possession of a firearm after having been convicted of a felony drug offense and received an effective sentence of life plus five years in confinement. On appeal, the Defendant claims that the trial court erred by redacting his psychological expert's report and by limiting the expert's testimony. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and KYLE A. HIXSON, JJ., joined.

Daniel J. Murphy (on appeal), Lewisburg, Tennessee, and J. Caleb Cassell (at trial), Nashville, Tennessee, for the appellant, Joshua Terelle Gaines.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah Housel and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On February 3, 2018, the Defendant's half-brother found Tivvis Garrison, the Defendant's aunt, dead in her home. She had been shot five times. The next day, the police conducted a traffic stop of the Defendant, who had been living with the victim at the time of her death, and arrested him.

The trial court ordered a forensic evaluation to determine the Defendant's competency to stand trial. Dr. Mary Elizabeth Wood, a member of the Vanderbilt Forensic Psychiatry evaluation team, conducted the evaluation on February 21, 2018. Due to her concerns about the Defendant's mental state, Dr. Wood deferred the competency issue and recommended an inpatient evaluation at Middle Tennessee Mental Health Institute ("MTMHI"). The Defendant was admitted to MTMHI on May 1, 2018, for thirty days. During his stay, he received competency training and treatment. On May 29, 2018, the MTMHI forensic evaluation team concluded that he was competent to stand trial and found no basis for an insanity defense.

In September 2018, the Davidson County Grand Jury indicted the Defendant for first degree felony murder, first degree premeditated murder, especially aggravated robbery, and being a felon in possession of a firearm after having been convicted of a felony drug offense. In November 2019, the Defendant gave notice of expert testimony pursuant to Tennessee Rule of Criminal Procedure 12.2(b). The Defendant attached Dr. Charles Ihrig's curriculum vitae and Forensic Psychological Evaluation report to the notice. In the final paragraph of the report, Dr. Ihrig wrote as follows:

> [The Defendant's] psychotic state did affect his deliberation of the crime. He lacked the ability to use reflective and reasonable insight and judgment due to his psychotic thought process. He was fueled by delusions and active command hallucinations. He felt powerless over the voices in his head[,] and he lacked the insight to see that these were not real and subsequently lacked the ability to resist their demands. This condition, as described by [the Defendant] himself, was not one of a cool state of blood required for deliberate action. It is one of hot blood or passion, which affected his decision-making process in the commission of this crime.

The State filed a motion to exclude Dr. Ihrig's proposed expert testimony, asserting that his report did not meet the legal standard required for diminished capacity because Dr. Ihrig did not state that the Defendant lacked the capacity to form the requisite mental states to commit the charged offenses as required by *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997). In response to the State's motion, Dr. Ihrig revised his report to include the following bulleted points after his final paragraph:

- The Defendant did not have the capacity to form premeditation during the period of time relevant to the State's accusations.

- The Defendant did not have the capacity to act knowingly to commit the alleged robbery during the period of time relevant to the State's accusations.

- 2 -

- The Defendant did not have the capacity to act intentionally to commit the alleged robbery during the period of time relevant to the State's accusations.

On December 18, 2019, the trial court held a hearing on the State's motion to exclude Dr. Ihrig's expert testimony. During the hearing, Dr. Ihrig testified that a psychologist's clinical interview of a patient was the most important piece of information in psychological evaluation and that he interviewed the Defendant on August 30, 2019. The Defendant was competent, but Dr. Ihrig concluded that he was psychotic and lacked the capacity to commit the crimes. Dr. Ihrig thought his original report sufficiently conveyed his opinion of the Defendant's diminished capacity. He said his revised report was identical to his original report except for the bulleted points, which he added for "clarification." On February 3, 2020, the trial court issued a written order in which it ruled that Dr. Ihrig's proposed testimony complied with the requirements of *Hall* and was admissible under Tennessee Rule of Evidence 702.

In September 2021, the Defendant filed a motion in limine to admit into evidence at trial Dr. Ihrig's written report and the materials upon which Dr. Ihrig relied for the Defendant's psychological evaluation. In the motion, the Defendant advised the trial court that while the report and underlying materials contained statements made by the Defendant and others, the statements were not hearsay because they were not being offered for their truth but for their effect on the listener, Dr. Ihrig. The Defendant also claimed that even if the report and underlying materials contained hearsay statements, the probative value of the evidence in assisting the jury with evaluating Dr. Ihrig's opinion substantially outweighed the evidence's prejudicial effect. In January 2022, the State filed a motion in limine to exclude any evidence of the Defendant's competency issues and training at MTMHI because his competency was not an issue at trial and would only confuse the jury.

On March 31, 2022, the trial court held a hearing on both motions. Addressing the Defendant's motion that he be allowed to introduce into evidence Dr. Ihrig's report and all of the underlying materials Dr. Ihrig considered for the Defendant's evaluation, the State argued that the report and underlying materials contained inadmissible hearsay and that the probative value of the evidence in helping the jury evaluate Dr. Ihrig's opinion did not substantially outweigh the evidence's prejudicial effect as required by Tennessee Rule of Evidence 703. Addressing the State's motion that evidence of the Defendant's competency issues and training were irrelevant and would be confusing to the jury, defense counsel argued that the Defendant's need for intensive competency training at MTMHI in order to become competent to stand trial was "absolutely relevant" to his mental health at the time of the crimes.

- 3 -

Dr. Ihrig did not testify at the hearing, but the Defendant introduced Dr Ihrig's nine-page revised report into evidence as an exhibit. On the first page of the report, Dr. Ihrig listed his evaluation procedures, which consisted of his clinical interview of the Defendant, and an October 21, 2019 telephone interview of Kourtney Owens-Rader, the mother of the Defendant's eleven-year-old son. Dr. Ihrig then listed the materials he reviewed for the evaluation, which included Dr. Wood's February 26, 2018 Summary Letter of Competency to the trial court; the Defendant's May 2018 MTMHI records and the MTMHI forensic team's May 29, 2018 Final Staff Conference Progress Note; a dashcam video of the Defendant's arrest on February 4, 2018; a video recording of a detective's interview with Brittany Gaines, the Defendant's ex-wife, on February 5, 2018; and defense investigator Scott Cothran's audio-recorded interview of John and Shirley Gaines on February 23, 2019.

We have reviewed Dr. Ihrig's report, which mostly recounted his interview with the Defendant. Dr. Ihrig also summarized his interview with Ms. Owen-Rader. On the seventh page of his report, Dr. Ihrig briefly summarized Mr. Cothran's interview with John and Shirley Gaines, Dr. Wood's evaluation of the Defendant, the Defendant's MTMHI records, and the dashcam video. Regarding the interview with John and Shirley Gaines, Dr. Ihrig wrote that Mr. Gaines, who was the Defendant's father, denied knowing of any prior mental health treatment for the Defendant. However, Mr. Gaines said he thought that the Defendant's mental health had declined in the past few years and that the Defendant was acting "'very strange'" before the victim's death. Mr. Gaines recalled an "odd" conversation with the Defendant in which the Defendant talked about a razor and said "anything could happen during a blood moon." After the Defendant's arrest, the Defendant told Mr. Gaines that the Defendant and Donald Trump were friends, that "P. Diddy" had a contract on the Defendant's life, and that Beyonce was the Defendant's wife. Regarding the summary of Dr. Wood's evaluation, Dr. Ihrig wrote that Dr. Wood "expressed 'concerns regarding [the Defendant's] mental states'" at the time of her evaluation and "its impact on his competency to stand trial." Regarding the summary of the MTMHI records, Dr. Ihrig wrote that MTMHI diagnosed the Defendant with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, that the Defendant was medicated and treated for a psychotic disorder at MTMHI, and that he was deemed competent by MTMHI to stand trial. As to the summary of the dashcam video, Dr. Ihrig wrote that the video showed the Defendant "rambling about being the alien that was talked about in The Bible Chapter, Revelations"; making "incoherent statements about God and President Trump"; telling police officers that "he wanted his Bible and the papers that were with that book"; telling officers that his authority came from God, the FBI, the CIA, and President Trump; and telling officers that he was "'the second coming.'" Dr. Ihrig's report did not mention the Defendant's competency training and treatment and did not summarize Brittany Gaines's interview.

- 4 -

In addition to introducing Dr. Ihrig's report into evidence as an exhibit, the Defendant also introduced the underlying materials into evidence as exhibits. The trial court stated that it would review the exhibits and take the matter under advisement. On April 25, 2022, the trial court entered a written order. First, the trial court addressed the State's motion to exclude any evidence of the Defendant's competency issues and training. Noting that "competency and capacity are neither equivalent terms nor interchangeable," the trial court found that evidence of the Defendant's competency training "could be confusing and unhelpful" to the jury and granted the State's motion to exclude testimony about the Defendant's competency training. The trial court then addressed the Defendant's motion to admit into evidence Dr. Ihrig's written report and the underlying materials Dr. Ihrig considered. The trial court found that the report fell under the purview of Tennessee Rules of Evidence 702 and 703, which govern the admissibility of expert testimony. The trial court granted the Defendant's motion to admit the report into evidence at trial but with limitations to his testimony and redactions to his report, explaining:

> The summarization of the investigator Scott Cothran's interview is an included hearsay statement within the report, however it is not reasonably reliable information to experts in this particular field of expertise. As well, the summarization of the arrest dash cam video is to be redacted from the report. The Court also declines to admit the videos from the arrest dash cam, the interview of Brittany Gaines, and the interview of John and Shirley Gaines as part of the expert's report. Dr. Ihrig's testimony falls under the purview of evidentiary Rules 702 and 703, unlike the raw information which was distilled into the report. The Court does not find such extrinsic data would be probative in a way that substantially outweighs the potential prejudicial effect.

The Defendant proceeded to trial in July 2022. Although he does not contest the sufficiency of the evidence, we will summarize the proof presented.

Dr. Jason Cook, the victim's supervisor at the Department of Veteran Affairs Administration in Nashville, testified that the victim failed to show up for work on February 1 and 2, 2018. Concerned, Dr. Cook requested a welfare check. Sergeant Douglas Sykes of the Metropolitan Nashville Police Department ("MNPD") testified that he conducted the welfare check at the victim's home on February 2, 2018. The front door was locked, and Sergeant Sykes could not see through the windows because the blinds were drawn. The victim's Honda CRV and the Defendant's Cadillac CTS were parked in the driveway, but nothing seemed amiss, so Sergeant Sykes wrote his report and left the scene.

Franco Garrison, the Defendant's half-brother and the victim's nephew, testified that on February 1 and 2, 2018, the victim's mother was unable to get in touch with the victim. The Defendant lived with the victim, so Mr. Garrison telephoned the Defendant and told him to have the victim call her mother. The Defendant replied, "Okay." On Saturday, February 3, the victim's mother still had not heard from the victim, so Mr. Garrison telephoned the Defendant again and asked why the Defendant had not told the victim to call her mother. Mr. Garrison said that the Defendant "kind of act[ed] like his phone was messed up or something."

Mr. Garrison testified that he went to the victim's house about 12:00 p.m. to check on her. The victim's Honda CRV was parked in the driveway, and the Defendant's Cadillac CTS, which had a flat tire, was parked on the street. The victim's Honda CRV had been having mechanical problems, so Mr. Garrison had loaned his car, a Cadillac CTS like the Defendant's car, to the victim. However, Mr. Garrison's Cadillac CTS was not at the victim's house. Mr. Garrison could not get into the house, so he telephoned the Defendant. The Defendant told Mr. Garrison that he was out of town and that he would be back in a couple of hours. Mr. Garrison was suspicious because the Defendant had not told Mr. Garrison that he was going out of town. Mr. Garrison decided to break into the victim's house and used a screwdriver to get inside. He went to the victim's bedroom and saw blood "everywhere." The victim was lying on her side on the bed. She was clothed, and pieces of sweet potato were on the bed. Mr. Garrison wiped the victim's face with a wet towel and called 911. The 911 operator instructed Mr. Garrison on CPR, so he moved the victim onto the floor and performed CPR until the police arrived.

Mr. Garrison testified that he later telephoned the Defendant and told the Defendant that the victim was deceased. The Defendant responded, "[O]h," without any emotion. Mr. Garrison thought the Defendant had killed the victim and had left in Mr. Garrison's Cadillac CTS. Mr. Garrison explained his reasoning to the jury: All of the doors to the victim's house were locked from the inside when Mr. Garrison arrived, so the only way to get out of the house was through the garage. The garage door was closed, which meant the Defendant used his garage door opener to close the garage door when he left.

On cross-examination, Mr. Garrison testified that he and the Defendant grew up with the victim and that the victim was more like a sister to Mr. Garrison than an aunt. The victim loved the Defendant, and Mr. Garrison thought the Defendant loved the victim. Mr. Garrison did not notice the Defendant acting out of the ordinary in the weeks leading up to the victim's death.

The first police officer to arrive at the scene testified that Mr. Garrison led him to the victim's bedroom and that the victim was deceased and in an advanced stage of decomposition. Another officer testified that pieces of raw sweet potatoes were all over

the victim's bed and the bedroom floor. The officer saw whole sweet potatoes on the kitchen counter and pieces of partially-cooked sweet potatoes on the kitchen floor.

Based on information provided by Mr. Garrison, law enforcement issued a be-on-the-lookout, or "BOLO," for Mr. Garrison's Cadillac CTS. About 12:30 a.m. on February 4, 2018, a police officer stopped a white Cadillac CTS being driven by the Defendant in East Nashville for failing to stop for a flashing red traffic light. The Defendant was a person of interest in the victim's homicide, so the officer handcuffed him and put him into the back of a patrol car. The officer testified that he did not notice anything unusual about the Defendant's behavior. Subsequently, another officer, who was moving the Cadillac CTS out of the roadway, found a revolver on the driver's floorboard. The gun was a .38 Special Smith & Wesson and was fully loaded with five rounds. A police officer who later processed the Cadillac CTS for evidence testified that he found two of the victim's purses in the trunk of the car. One of the purses contained a piece of raw sweet potato and a washcloth.

Howard Harris testified that about 10:00 p.m. on February 3, 2018, he and his wife took an Uber ride in a Cadillac CTS to their home. The Defendant was their driver. Mr. Harris said that the duration of the ride was about twenty-two minutes and that the Defendant "was engaging and we talked about music and how beautiful that Cadillac car was." After the ride, Mr. Harris gave the Defendant a five-dollar tip and left him a five-star rating.

Dr. Miguel Laboy, an expert in forensic pathology, testified that he performed the victim's autopsy. The victim was forty-seven years old and sustained five gunshot entrance wounds: four to her head and one to her left hand. Dr. Laboy saw sparse powder stippling on one of the head wounds and powder stippling on the hand wound. He did not find any stippling on the other wounds and concluded that all the bullets were fired from intermediate range. Dr. Laboy recovered two bullets from the victim's body. He said he recorded the victim's time and date of death on her autopsy report as 6:40 p.m. on February 3, 2018; however, her body was in an advanced stage of decomposition when it arrived at the medical examiner's office, so he could not determine her exact date and time of death. Dr. Laboy concluded that the victim's cause of death was the gunshot wounds and that her manner of death was homicide. On cross-examination, Dr. Laboy acknowledged that a solid object, such as a sweet potato, placed between the muzzle of a gun and a victim could impede stippling on the victim.

The State read a stipulation of fact to the jury. The stipulation provided that the Defendant had a prior conviction for a felony drug offense.

The State played the video-recorded deposition testimony of MNPD Detective Joseph High, an expert in call detail analysis, for the jury. Detective High analyzed the Defendant's cellular telephone records for January 28 to February 4, 2018. On the night of January 29, the Defendant's telephone was in Atlanta, Georgia. On the morning of January 31, the Defendant's telephone was in Ripley, Tennessee, which was near Memphis. At 11:08 a.m. on February 1, 2018, the Defendant's telephone was back in Atlanta. Between 11:35 a.m. on January 31 and 11:08 a.m. on February 1, the Defendant's telephone was "not reachable," which indicated to Detective High that the telephone had been turned off. Detective High performed a "logical extraction" of the victim's cellular telephone and discovered that the last activity on her telephone occurred when she sent a text message at 8:42 p.m. on January 31, 2018.

MNPD Sergeant Zachariah Bevis, the lead investigator for the case, testified that he went to the scene after the victim's body was discovered and met with Mr. Garrison, who was very upset. Based on Mr. Garrison's information, Sergeant Bevis issued the BOLO for Mr. Garrison's Cadillac CTS. After Dr. Laboy issued the victim's autopsy report, which showed that the victim had been shot four times in the head, the police searched the victim's house pursuant to a search warrant. They found two bullets in fabric they collected from the victim's bed.

Sergeant Bevis testified that he theorized the Defendant killed the victim on the night of January 31, sometime after the victim sent her last text message. The victim drove Mr. Garrison's Cadillac CTS in the days leading up to the victim's death, and police officers found her personal items, including her credit cards and cellular telephone, in the trunk of the car. Sergeant Bevis acknowledged that the Defendant did not use the victim's credit cards or telephone after her death and that the victim may have put the items into the trunk herself. He said, though, that he thought the Defendant took the items from the victim's house and put them into the trunk after the Defendant killed the victim. Sergeant Bevis also thought the Defendant cleaned the revolver after the shooting, possibly using the washcloth that was found in one of the victim's purses. Sergeant Bevis said that he had never seen a sweet potato used as a gun silencer prior to this case and estimated that the Defendant used three to five sweet potatoes during the shooting.

Rhonda Evans, a forensic scientist with the MNPD Crime Laboratory and an expert in firearms and toolmark identification, testified that she analyzed the two bullets recovered from the fabric on the victim's bed, the two bullets recovered from the victim's body, and the revolver found in Mr. Garrison's Cadillac CTS. She concluded that the four bullets were fired from the revolver. Don Carman of the MNPD Crime Laboratory and an expert in firearm tool investigation testified that information about using a sweet potato as a gun silencer was available on the internet. At the State's request, Mr. Carman conducted an experiment in which he cut a hole into a sweet potato, inserted the muzzle of a .38 Special

revolver into the hole, and fired the revolver. The sweet potato "blew everywhere" when he fired the gun.

Dr. Ihrig, an expert in forensic psychology and diagnostic assessment, testified for the Defendant that the defense hired him to evaluate the Defendant. Dr. Ihrig recalled his procedures and the materials he reviewed for the jury.

Dr. Ihrig testified that Dr. Wood, a psychologist, interviewed the Defendant in February 2018. Dr. Wood was concerned about the Defendant's mental health and recommended that he receive an inpatient psychological evaluation at MTMHI. The Defendant was admitted to MTMHI on May 1, 2018, for a thirty-day stay and was diagnosed with "unspecified schizophrenia spectrum and other psychotic disorder." Officials at MTMHI reported that the Defendant had poor hygiene, depressed mood, irrelevant and tangential thoughts, paranoia, and "[g]randiose, bazaar and religious delusions." The Defendant experienced auditory and visual hallucinations and was treated for a psychotic disorder at MTMHI.

Dr. Ihrig testified from his report that during his interview with Ms. Owens-Rader, she told him that the Defendant was violent throughout their relationship, that the Defendant threatened her and their son, and that she attributed the Defendant's violent behavior to his ongoing mental health issues for which he refused to seek treatment. Ms. Owens-Rader recalled that the Defendant would spit and blow his nose into his hands and then rub the liquid onto her face. He also choked her. The Defendant threatened to take their son to Mexico and run through the border gates so that agents would shoot and kill them both. Ms. Owens-Rader stated that the Defendant heard voices and insisted he could talk to aliens and that he created an elaborate scheme to rob her "boss." The Defendant did not go through with the plan but hid in the bushes outside her boss's home for five hours. Ms. Owens-Rader said that she often feared for her life when she was in the Defendant's presence but that she was surprised he killed the victim. The victim helped the Defendant, and they had a close relationship, so Ms. Owens-Rader thought it was "a little more odd" that the Defendant killed the victim. Dr. Ihrig said he had to "be careful a little bit" in his consideration of statements made by others, especially Ms. Owens-Rader because she had a tumultuous relationship with the Defendant. However, Dr. Ihrig gave her interview "some decent weight."

Dr. Ihrig testified that he interviewed the Defendant on August 30, 2019. The Defendant was alert and was groomed and dressed appropriately but made poor eye contact and had tangential and delusional thoughts. Reading mostly from his report, Dr. Ihrig said the Defendant claimed that he had been fasting from food since March 2019, that his son had "'[t]he mark of the beast'", and that "'[t]his all happened on the blood moon.'" Dr. Ihrig said the Defendant "talked about how God is the host and a host has a parasite. We

are hosts and we feed on him." The Defendant claimed he was "'not in [his] right mind'" before or after the shooting. The Defendant said he had been living with the victim for four or five months because his ex-wife falsely claimed he choked her and "'put the law on'" him. The Defendant said that he and the victim used to have a close relationship but that she chose his ex-wife over him.

Dr. Ihrig testified that the Defendant told him the following about the victim's death: In January 2018, the Defendant was living with the victim and was a driver for Uber. He also said he was not working and was "'[g]oing through it mentally.'" The Defendant's car had a flat tire, so he began driving the victim's Honda CRV. On January 31, 2018, the Defendant drove to Atlanta and "'did something [he] probably shouldn't have done.'" He said he masturbated and "mixed his semen with a drink [and] drank it for clarification." The Defendant returned to the victim's house and sat down on the steps because he could not find his key to get into the house. He heard a voice coming from the Cadillac inside the garage, and the voice was angry with him. The Defendant knocked on the victim's door and asked the voice, "You want me to kill her[?]" The victim came to the door and unlocked it, and the Defendant went inside and sat on a bench. The Defendant told the victim about the voice and told her that he was afraid. The victim left her house in the Cadillac CTS, and the Defendant left in the victim's Honda CRV. The Defendant drove to Memphis and later returned to the victim's house. The Defendant was asked if he had any memory of the victim alive, and the Defendant responded, "'I just remember the darkness.'" The Defendant said that the gun used in the shooting belonged to his grandfather and that he did not know why he used the sweet potatoes. Dr. Ihrig stated that the Defendant's timeline of events was "very unclear," that his story was "bouncing between situations," and that his psychosis caused his story to be disorganized and "nonsensical." Dr. Ihrig likened the Defendant's brain to a disorganized file cabinet.

Dr. Ihrig testified that the dashcam video of the Defendant's arrest showed that the Defendant exhibited extremely unusual behavior. The Defendant's speech was "rapid, pressured, [and] he made unusual statements that indicate[d] delusions" on the video. Dr. Ihrig found "a clear pattern of the existence of mental illness before, close to, and after the alleged crime," and Dr. Ihrig's observations were consistent with the results of the Defendant's evaluation at MTMHI.

Defense counsel asked Dr. Ihrig about the Defendant's seemingly normal Uber drive on the night of February 3, 2018. Dr. Ihrig said that he was not surprised by the Defendant's normal behavior because a person with a psychotic disorder could feign normalcy until a "trigger," such as stress or anxiety, caused the person to reach a breaking point.

Dr. Ihrig testified that, in his opinion, the Defendant's mental illness affected the Defendant's decision to take the victim's life. The Defendant knew his actions were wrong, and he appeared to make "some disorganized and highly ineffective efforts to cover up the crime." However, there was no clear evidence of a motive for the killing, and the crimes were "impulsive and likely influenced by his mental state." Regarding the charge of first degree premeditated murder, Dr. Ihrig concluded that the Defendant's psychotic state affected his ability to deliberate and that he "lacked the ability to use reflective and reasonable insight and judgment due to his psychotic thought process." In other words, the Defendant was unable to premeditate the killing. Regarding especially aggravated robbery, the underlying crime for first degree felony murder, Dr. Ihrig concluded that the Defendant did not have the capacity to act intentionally or knowingly.

The Defendant introduced Dr. Ihrig's written report into evidence. Any mention of the Defendant's competency to stand trial was redacted from the report. Dr. Ihrig's summary of Mr. Cothran's interview with John and Shirley Gaines and Dr. Ihrig's summary of the dashcam video also were redacted.

On cross-examination, Dr. Ihrig testified that he did not administer any psychological tests to the Defendant. He also did not evaluate the Defendant for malingering. Dr. Ihrig acknowledged that MTMHI administered a malingering test to the Defendant in 2018. The Defendant's score was fourteen, and scores of six or more suggested malingering. Dr. Ihrig explained that the Defendant's high score was evidence that he was "faking regarding competency, not his core mental illness." Dr. Ihrig said that he did not think the Defendant was malingering psychosis and reiterated that he did not think the Defendant had the capacity to premeditate killing the victim.

Dr. Ihrig testified that he did not review any crime scene photographs or the victim's autopsy report. He also did not ask the Defendant how the Defendant used the sweet potatoes or how the Defendant attached the sweet potatoes to the gun. The Defendant did not admit to shooting the victim and did not tell Dr. Ihrig that he drove for Uber on February 3, 2018. Dr. Ihrig acknowledged that the Defendant was able to follow the Uber directions and that the police found the Defendant with a fully-loaded revolver. Dr. Ihrig also acknowledged that the Defendant knew right from wrong and that the Defendant "tried to cover up [some of] what he'd done." Nevertheless, Dr. Ihrig concluded that the Defendant was psychotic and suffered from acute mental illness at the time of the shooting. Officials at MTMHI diagnosed the Defendant with schizophrenia in 2018, and Dr. Ihrig did not disagree with that diagnosis.

On redirect-examination, Dr. Ihrig testified that officials at MTMHI prescribed Haldol, an antipsychotic medication, and Trazadone, an antidepressant medication, to the Defendant. He acknowledged that they would not have prescribed those medications if

they had thought the Defendant was "faking it." Dr. Ihrig also acknowledged that his diminished capacity opinion only negated a conviction of first degree murder; the jury could still convict the Defendant of a lesser-included offense.

Dr. Mary Elizabeth Wood, an assistant professor of psychiatry at Vanderbilt University Medical Center and an expert in forensic psychiatry, testified on rebuttal for the State that she evaluated the Defendant on February 21, 2018, just eighteen days after the shooting, and diagnosed him with "unspecified schizophrenia and other psychotic spectrum disorder." After her diagnosis, the Defendant was evaluated at MTMHI. Officials at MTMHI administered the M-FAST, which Dr. Wood said was "a screener to determine if someone is overreporting or faking psychological symptoms." Given the Defendant's high score on the test, a fourteen, Dr. Wood was concerned that he was "feigning or faking." She said that some psychiatric disorders fluctuated between acute and less acute phases, meaning that a person's symptoms could be more obvious at times and that the person could feign normalcy at other times.

Dr. Wood testified that in September 2020, she conducted a court-ordered forensic evaluation of the Defendant to determine his mental state at the time of the shooting. As part of her evaluation, she reviewed the Defendant's jail and MTMHI records, Dr. Ihrig's written report, crime scene photographs, the victim's autopsy report, police reports, interviews with the Defendant's family members, the dashcam video of the Defendant's arrest, and the Defendant's jailhouse telephone calls. Dr. Wood noted that at the end of one of those calls, the Defendant said, "It's looking good for my insanity plea." The Defendant's statement gave Dr. Wood "some concerns about sort of a self-serving bias[.]" Dr. Wood said that she met with the Defendant virtually and that he was "kind of evasive" when she asked him for details of the shooting.

Dr. Wood testified that she concluded the evidence did not support an insanity defense or a defense based on diminished capacity. She said "the most crucial" basis for her opinion was the Defendant's use of the sweet potatoes during the shooting because the Defendant had to obtain multiple sweet potatoes from another room, cut holes into the potatoes, and place the potatoes onto the muzzle of the gun. The Defendant also made efforts to avoid detection after the shooting, such as turning off his telephone; his whereabouts were unknown for an extensive period of time. Dr. Wood said that the Defendant suffered from a severe mental illness and that he could have been psychotic at the time of the shooting. She said, though, that his actions convinced her that he had "the capacity to engage in insight and reflective judgment as evidenced by his . . . behaviors in those moments." Dr. Wood found no evidence to suggest that the Defendant was unable to form the requisite mental state to commit the crimes or that he was unable to premeditate the killing.

On cross-examination, Dr. Wood testified that she thought she correctly diagnosed the Defendant with schizophrenia in February 2018, noting that officials at MTMHI also diagnosed him with schizophrenia. Dr. Wood stated that the Defendant suffered from "a severe and persistent mental illness" but that even someone with a mental illness could malinger.

Dr. Wood testified that Mr. Gaines, the Defendant's father, said he saw the Defendant on January 31, 2018. Mr. Gaines stated that the Defendant was "in a daze" and that the Defendant claimed "anything could happen on a blood moon." The Defendant repeatedly asked his father for a shaving razor and wanted a specific kind of razor, which Mr. Gaines thought was odd. Dr. Wood said that she mostly agreed with Dr. Ihrig's testimony but that she disagreed with his conclusion that the Defendant could not premeditate the killing.

At the conclusion of the proof, the jury convicted the Defendant as charged in the indictment of first degree felony murder, especially aggravated robbery, and being a felon in possession of a weapon after having been convicted of a felony drug offense. The jury convicted him of second degree murder as a lesser-included offense of first degree premeditated murder. After a sentencing hearing, the trial court issued a sentencing order in which it sentenced the Defendant to life for first degree murder and twenty-two years for second degree murder, a Class A felony. The trial court merged the murder convictions. The trial court sentenced the Defendant to twenty years for especially aggravated robbery, a Class A felony, and five years for being a felon in possession of a firearm after having been convicted of a felony drug offense, a Class C felony. The trial court ordered that the Defendant serve the twenty-year sentence concurrently with the life sentence but that he serve the five-year sentence consecutively to the life sentence for a total effective sentence of life plus five years.

## ANALYSIS

The Defendant claims that the trial court abused its discretion by ordering limitations to Dr. Ihrig's testimony and by ordering redactions of Dr. Ihrig's report with regard to the Defendant's competency training and treatment at MTMHI; Mr. Cothran's interview of John and Shirley Gaines; Brittany Gaines's interview; and the dashcam video of the Defendant's arrest. The Defendant acknowledges that each separate piece of information was inadmissible and was "waning in relevance" but asserts that the information collectively demonstrated a pattern of mental illness before, near, and after the crimes such that the probative value of the evidence significantly outweighed its prejudicial effect. The State argues that the trial court did not abuse its discretion and that any error was harmless. We agree with the State.

Tennessee Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

"[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). "A trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703." *Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011). "Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." *State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Regarding the trial court's limiting Dr. Ihrig's testimony and redacting references to the Defendant's MTMHI competency training from Dr. Ihrig's report, competency to stand trial means that a defendant must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). Diminished capacity involves "a

defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state." *Hall*, 958 S.W.2d at 688. MTMHI determined in May 2018 that the Defendant was competent. The Defendant did not dispute shooting the victim, and the only issue at trial was whether he suffered from diminished capacity at the time of the shooting.

The trial court held a hearing on the State's motion to exclude evidence of the Defendant's competency training and treatment and concluded that the evidence would be confusing to the jury because the Defendant's competency was not an issue at trial. Dr. Ihrig did not testify at the hearing, and the Defendant never made an offer of proof for Dr. Ihrig's excluded testimony. *See* Tenn. R. App. P. 36(a). Moreover, while Dr. Ihrig mentioned several times in his report that the Defendant was found competent to stand trial, Dr. Ihrig's report did not address the Defendant's competency training and treatment at MTMHI. Therefore, nothing in the record shows that Dr. Ihrig considered the Defendant's competency training and treatment to be relevant to Dr. Ihrig's evaluation of the Defendant or that the evidence would have been helpful to the jury's consideration of the Defendant's diminished capacity claim. *See* Tenn. R. Evid. 401 (providing that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Thus, we conclude that the trial court did not abuse its discretion in ruling that evidence of the Defendant's competency training and treatment was inadmissible.

As to the video-recorded interview of Brittany Gaines, the audio-recorded interview of John and Shirley Gaines, and the dashcam video of the Defendant's arrest, we initially note that although Dr. Ihrig listed Brittany Gaines's interview as an item he reviewed for the Defendant's evaluation, Dr. Ihrig did not summarize the interview or further mention it in his report. The Defendant also did not make an offer of proof for Dr. Ihrig's proposed testimony about the interview. *See* Tenn. R. App. P. 36(a). Therefore, we find no merit to the Defendant's claim that the trial court erred by prohibiting Dr. Ihrig's testimony about Brittany Gaines's interview or redacting the interview from Dr. Ihrig's report.

The trial court concluded that Dr. Ihrig's summaries in his report about John and Shirley Gaines's interview and the dashcam video were hearsay. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, "[h]earsay is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802. We agree that Dr. Ihrig's summary of John Gaines's statements, which were being offered for their truth to show the Defendant's diminished capacity, was hearsay. Likewise, the Defendant's own self-serving statements

- 15 -

on the dashcam video, which was being offered by the Defendant to show his diminished capacity, were hearsay. *See State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985).

> Although the rules of evidence permit expert witnesses to rely upon reliable hearsay in forming their opinions, the rules do not permit otherwise inadmissible evidence to be admitted under the guise of the expert's opinion unless the proponent of the evidence can show that the prejudicial effect of the evidence is substantially outweighed by the probative value of the evidence in assisting the jury's understanding of the expert's opinion.

*State v. Kirk*, No. E2010-01390-CCA-R3-CD, 2011 WL 5910201, at *5 (Tenn. Crim. App. Nov. 28, 2011) (internal citations omitted). Here, the trial court specifically found that the probative value of the underlying materials, including Brittany Gaines's interview, did not substantially outweigh their prejudicial effect. Thus, we conclude that the trial court did not abuse its discretion by limiting Dr. Ihrig's testimony, by redacting his report, and by excluding the materials from being introduced into evidence at trial.

We also conclude that even had the trial court erred, the error would have been harmless. The proof at trial established that the Defendant prepared multiple sweet potatoes to use as gun silencers when he shot the victim five times on January 31, 2018. After the shooting, the Defendant fled the scene with the victim's personal items, turned off his cellular telephone, and drove to Atlanta. On February 2, Mr. Garrison telephoned the Defendant and told him to have the victim telephone her mother, and the Defendant responded, "Okay." When Mr. Garrison telephoned the Defendant on February 3 and asked why the Defendant had not told the victim to telephone her mother, the Defendant acted like something was wrong with his telephone. The Defendant returned to Nashville that day and worked as an Uber driver. The Defendant acted normal during his drive with Mr. Harris, and Mr. Harris was so pleased with the Defendant that he tipped the Defendant and left him a positive review. Dr. Ihrig testified extensively about his interviews with the Defendant and Ms. Owens-Rader, and defense counsel cross-examined Dr. Wood about John Gaines's interview. Through that cross-examination, the jury heard statements by Mr. Gaines that the trial court had redacted from Dr. Ihrig's report. We note that while the jury convicted the Defendant as charged in the indictment of first degree felony murder, the jury found him guilty of second degree murder as a lesser-included offense of first degree premeditated murder. Thus, we conclude that even if the trial court had erred by limiting Dr. Ihrig's testimony and redacting his report, the error would have been harmless.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

s/ John W. Campbell<br>
JOHN W. CAMPBELL, SR., JUDGE